This is a suit by a trustee in bankruptcy to set aside transfers made by the bankrupt while insolvent and within four months before the filing of the petition in bankruptcy. When the cause first came to final hearing, I found that the trustee had not sustained the burden of proving that the transferees knew or had reasonable cause to believe that the debtor was insolvent, and therefore I advised a decree dismissing the bill. Upon appeal, the Court of Errors and Appeals ordered that the decree "be and the same is hereby in all things reversed, set aside and for nothing holden with costs of appeal to be paid by respondents, and that the record and proceedings be remitted to the Court of Chancery to be therein proceeded on according to law and the practice of said court." In an opinion which is reported in 138 N.J. Eq. 472, Mr. Justice Bodine, after reviewing the evidence, finds that the defendants were chargeable with knowledge of the insolvency. Without considering any of the meritorious questions which are dealt with below, the conclusion is stated: "Suffice it that in our view, the transfers in question were void under the Bankruptcy Act and must be set aside."
On the determination of an appeal, a copy of the final order or decree of the Court of Errors and Appeals, but not its opinion, is filed with the clerk in Chancery, "which order or decree the Court of Chancery shall thereupon carry into effect." R.S.2:29-124. An affirmance by the Court of Errors and Appeals requires no new decree by Chancery, since the original Chancery decree remains in full force. On a *Page 227 
reversal, the decree of the Court of Errors and Appeals does not, of and in itself, alter the Chancery decree, but it becomes the duty of this court to vacate its original decree and substitute therefor a decree conforming to the decree of the appellate tribunal. In re Streeper, 93 N.J. Eq. 102.
It used to be customary for a decree of reversal to include a direction that a decree be entered in the Court of Chancery of a certain stated tenor. Dickinson, Chancery Precedents, 199. When the remittitur is so drawn, the function of Chancery is simply to order "that the decree of the Court of Errors and Appeals be and the same is hereby made the decree of this court."Remittiturs sometimes order further proceedings in Chancery "according to law and the practice of said court and in conformity with the opinion of this court." Passaic, c., TrustCo. v. East Ridgelawn Cemetery, 139 N.J. Eq. 488. In this manner, the opinion is inserted in, and becomes part of, theremittitur. Unless some such course is pursued, the opinion is not a part of the record either of the Court of Errors and Appeals or of this court; it is a formal statement of the reasons for making the decree. R.S. 2:27A-6. In the present instance, the remittitur constitutes "the sole guidance of the court below after the cause is remitted." Kanzler v. Smith, 125 N.J. Eq. 466; Tuttle v. Gilmore, 42 N.J. Eq. 369; Whitfield v.Kern, 125 N.J. Eq. 511.
The Vice-Chancellor is free, and in duty bound, to advise and the Chancellor to make whatever decree appears to them equitable upon the pleadings and proofs, subject, however, to limitations imposed by principles of res judicata or similar thereto. Chancery should not again dismiss the bill; the complainant is entitled to some relief. What relief, remains to be determined by Chancery. The decree of the Court of Errors and Appeals is also conclusive as to facts without which it could not have been rendered. In order to learn what were the factual findings on which the decree was based, the opinion may be read. Locher v.Locher, 112 N.J. Eq. 25; Sullivan v. Aetna Casualty, c., Co.,190 Atl. Rep. 72; affirmed, 115 N.J. Law 253. The opinion of Mr. Justice Bodine shows that the decree of reversal was founded on the fact that the defendants were aware, or should have been *Page 228 
aware, of their debtor's insolvency. The parties are now concluded by this finding. On questions of law, the opinion has the same effect as every other opinion of our highest court, namely, it settles the law for the Court of Chancery. It has also special force as the law of the particular case. It cannot be "distinguished" or offset by another supposedly conflicting decision of the same tribunal. It is final as to issues of law which are specifically decided and which enter into the decree. But the closing statement in the opinion that "the transfers in question were void under the Bankruptcy Act and must be set aside," is not conclusive for the same decree of reversal would have been made whether all or only one of the transfers should be avoided. A most helpful authority is Wemple v. B.F. GoodrichCo., 125 N.J. Eq. 220; 127 N.J. Eq. 333. A decree for specific performance was reversed with the remittitur in the same form as in the present case. The opinion of the appellate court disclosed the reason for the reversal, that complainant's proper remedy was an action at law. "The decree is therefore reversed with costs to the end that the bill may be dismissed." On further proceedings in Chancery, notwithstanding the sentence which I have quoted from the opinion, the bill was not dismissed, but the cause was transferred to a law court. This action was affirmed on a second appeal. It is my duty to study the facts and the arguments presented as to each transaction.
The bankrupt, Tip Top Tailors, Inc. (which I will designate "Tip Top") had been organized and was controlled by a well-known Canadian firm, Tip Top Tailors, Limited (herein called "Limited"). The new company was created for the purpose of selling men's clothing at retail in the United States. In order to assure itself of a supply of clothing, it formed, in conjunction with Joseph Hilton Sons, of New York, a manufacturing company, named Allied Clothing Corporation ("Allied"), with which, in turn, it entered into contract, dated January 23d 1939, for the manufacture of all its clothing from cloth to be supplied by Tip Top. Tip Top agreed to pay cost, plus a percentage and the contract was for a term which would not expire until June 1st, 1944. By the fall of 1940, Tip Top had fallen into a bad financial situation. *Page 229 
On October 1st, officers of Limited and of Tip Top, had a conference with representatives of the principal creditors of the latter. Mr. David Dunkelman, the president of Limited, stated that he intended to make a careful survey of the debtor's affairs, in order to form an opinion whether it could be put on an income-producing basis. If he should come to an affirmative opinion, Limited would be willing to advance around $100,000 to the debtor and would endeavor to raise an additional $50,000 to $100,000 from the sale of preferred stock of the debtor. The creditors present agreed to take no action pending Dunkelman's survey. While the conference was in session, there were happenings at Allied's factory in Linden, New Jersey, where the clothes were made for Tip Top, which were the immediate cause of the transactions that are attacked in this suit. The employees went out on strike and picketed the plant. The seriousness of the situation was enhanced by the fact that Tip Top's business was selling clothes made to order. At its stores, it measured customers and then sent the specifications of each suit to the factory at Linden where the suits were made up. The prompt making of the suits was essential to the business. Dunkelman and the officers of Tip Top proceeded energetically to meet the situation. They made a tentative agreement with one Spiotta to do the manufacturing at his shop in Newark, and they arranged for a meeting with the Hiltons on Wednesday, October 3d, to cancel the Allied contract. At the conference, which lasted all day and until past midnight, the Hiltons were in a powerful position and they made the most of it. Allied had in its possession at Linden all of Tip Top's available stock of woolens and 650 suits in process, and asserted a lien thereon to secure a current debt of nearly $17,000. Of that sum, Allied needed $6,000 immediately to meet a payroll. On the other side of the ledger, Allied owed the debtor $14,750 but it was not yet due and could not be set off against the sum of $17,000 owing to Allied. Finally, an accord was reached.
Ten separate agreements or leases between Tip Top and the several Hilton Companies were canceled, including the manufacturing contract. Tip Top, with money supplied by *Page 230 
Limited, paid, or Limited itself paid, to Allied $16,750 in satisfaction of the current debt. As part of the settlement, Limited paid $9,150 to a corporation of the Hiltons, the Dominion Holding Company ("Dominion") and Tip Top assigned to Dominion the debt of $14,750 owed by Allied, and 50 shares comprising one-half of the capital stock of Allied. On the other hand, Dominion transferred to Tip Top 400 shares of Tip Top common stock, and more important, Allied released the suits in process of manufacture and the stock of woolens and lent to Tip Top all patterns used for making Tip Top clothes, in order that they might be copied.
The petition in bankruptcy was filed the next month, November, 1940.
The transfer of the 50 shares of Allied stock to Dominion may be conveniently dealt with first. When Allied was organized, half of its capital stock was issued to Dominion and half to Tip Top. The manufacturing agreement of January 23d 1939, which was made contemporaneously with the organization of Allied, contains these terms: The agreement shall terminate at the option of Allied in the event of the bankruptcy or insolvency of Tip Top. If it is so terminated, Tip Top shall transfer and deliver to Dominion the 50 shares of the capital stock of Allied without any compensation therefor whatever. The stock certificate bore on its face a memorandum that the shares were issued subject to all the terms of the manufacturing agreement. Dominion insists that the transfer of the shares to it in October, 1940, was not a preferential transfer because it had already a right to the shares. Allied, however, did not elect to terminate the contract because of the insolvency of Tip Top, and hence, strictly, the provision for the stock transfer did not come into operation. But I do not stress this. It seems to me equitable, upon charging Allied and Dominion with notice of Tip Top's insolvency, and hence subjecting the settlement to the operation of the bankruptcy statute, then to resolve the rights of the parties on the same basis as if Allied had elected to terminate the contract because of Tip Top's insolvency.
Where more than four months before the filing of the petition in bankruptcy, there has been a transfer of the debtor's *Page 231 
title or a good lien has been created, then a transaction within the four months' period perfecting or enforcing the prior transfer or lien, is not voidable. Crosby v. Packer,22 Fed. Rep. 2d 609. But where there has been no such prior transfer of title or acquisition of lien, and where no present fair consideration is paid, then a transfer made within four months pursuant to an antecedent executory contract, is voidable. As against the trustee in bankruptcy, the promisee can only liquidate his damages for the breach of contract and receive a dividend at the same rate as other creditors of the same class.Irving Trust Co. v. Superior Credit Corp. (N.Y.),188 N.E. Rep. 84; In re Great Western Manufacturing Co.,152 Fed. Rep. 123; 81 C.C.A. 341; White v. Barnard, 29 Fed. Rep. 2d610; 8 C.J.S. 743.
The paragraph in the manufacturing agreement relative to this stock was not intended to secure to Dominion the payment of a debt or fulfillment of any obligation by Tip Top, and therefore did not create a lien. It is also clear that the agreement, even when aided by the endorsement on the certificate, did not operate to vest in Dominion a present title to the shares, legal or equitable. Dominion had merely a contractual right which matured upon the insolvency of Tip Top, and Allied's election to terminate the manufacturing agreement. The transfer of the shares to Dominion, viewed alone, was a preference, voidable under the Bankruptcy Act.
Let us next turn to the alleged lien of Allied upon the suits and woolens. The trustee argues in the first place that the proof of Tip Top's debt for which the lien is claimed, is insufficient. If that were the only difficulty, I would open the proofs and receive more precise evidence as to the debt In the absence of statute and if not waived by the parties, Allied had a common law lien on the suits it made for Tip Top to secure the amount due for making those particular suits. But such a lien would not secure indebtedness for other suits manufactured and delivered to Tip Top, and it would not cover the stock of unused woolens. The defendants do not urge the common law lien, but rely on the statute, R.S. 2:60-221, c. The act gives to a processor a lien on the property of another which comes into his possession, that *Page 232 
is, a right to retain possession until paid, or if not paid within two months, then to sell. The lien secures whatever is due the processor for processing, trucking and storing said property, or other property for the same debtor. It is doubtful whether a tailor is a processor within the meaning of the statute, but I will assume that he is.
If a processor does the work for which the debt accrues pursuant to a contract that is inconsistent with the statutory scheme, he loses the benefit of the statute. By the manufacturing contract, Allied agreed to manufacture clothing for Tip Top in accordance with orders from time to time given by Tip Top. "Such clothing shall be manufactured from woolens and other cloths from time to time, supplied by the customer (Tip Top) in connection with such orders. * * * No right, title or interest in and to any such woolens, cloths, trimmings, or other materials, shall pass to, or become vested in, the manufacturer (Allied). * * * The manufacturer shall be accountable to the customer for the return of, and for all loss and/or destruction of, and/or damage to woolens, cloths, trimmings, or other materials, from time to time supplied by the customer for the purpose of this contract," c. The contract also provides that all orders shall be completed with reasonably due despatch, contains a formula for ascertaining the price, and continues: "Payment shall be made on the second and fourth Tuesdays of each month in respect of garments accepted by the examiners of the customer, as being in accordance with the contract, and shipped or made available for shipment up to and including the preceding Saturday, and not covered by prior payment."
The agreement that no right or interest in the woolens shall become vested in Allied, is broad enough to exclude the statutory lien on the woolens. Furthermore, it clearly appears that Allied must surrender possession of the finished suits before payment could become due. The contract governs and deprives Allied of the lien. Wiles Laundry Co. v. Hahlo (N.Y.), 11 N.E. Rep. 500;In re Heinsheimer (N.Y.), 108 N.E. Rep. 636; Clark Bros. v.Pou, 20 Fed. Rep. 2d 74. Tip Top did not, in fact, make payment in full on the second and fourth Tuesdays of every month *Page 233 
for clothing delivered up to the preceding Saturday, but fell into arrears. Such failure did not, in my opinion, make ineffective the waiver of the statutory lien. Allied had chosen in advance to rely on the general credit of Tip Top; when Tip Top failed to pay, Allied could not undo its past action and invoke the statute. In October, 1940, it has no lien; it has only the right of action of an unsecured creditor.
The case as against Limited is met with the assertion of a lien by that defendant. When the settlement between Tip Top and the Hiltons was agreed upon October 3d, it was well understood that the necessary moneys would be provided by Limited. Representatives of a number of large creditors were present at the conference and tentatively agreed to subordinate the debts due them to the amount that Limited would have to advance. The following day, Limited caused $18,000 to be transferred by telegraphic means, from Canada to the Canadian Bank of Commerce of New York, and there credited to the account of Tip Top in a special account opened for the purpose. Checks required the signature not only of an officer of Tip Top but also of Mr. Dunkelman, president of Limited. The same day a check was drawn on this account to Allied for $6,000, part of the sum owed by Tip Top. The closing of the remainder of the agreed settlement had been set for October 7th, but was postponed to Wednesday, October 9th. On that day, an additional telegraphic transfer of Limited's funds in the amount of $10,000, was made to the account of Tip Top, which I have mentioned. At the same time a check on this account to the order of Limited, $21,628.83, was drawn and credited to Limited in the same bank. Limited's checks were then drawn and delivered as follows:
 To Allied ........................................... $3,500.00
 To Allied, held in escrow until October 16th ........ 6,500.00
 To Hall, escrow agent, to be held until the
 exact amount due Allied be determined ............. 2,478.83
 To Dominion ......................................... 9,150.00

On October 19th, upon a supplemental compromise, Hall returned to Limited the check for $2,478.83 and was given instead Limited's check for $750, which amount he paid over *Page 234 
to Allied. So the amounts put out by Limited in effecting the settlement were, first, $6,000 paid to Allied on October 4th, and second, $19,900 paid to Allied and Dominion on October 9th. The first payment was made in reliance on the agreement of the creditors to subordinate and without thought of a lien. But before the time for closing arrived, a large creditor made known that it would not subordinate beyond the $6,000, and the other creditors thereupon drew back. Someone suggested that Limited could safely go ahead if it took a lien on part of the stock of the woolens which in all was worth upwards of $100,000. This course was agreed upon. In the woolen trade it is not unusual for the owner of woolens which are kept on his own premise, to lease a part of his storeroom to a warehouse company, which thereupon erects within the leasehold a "warehouse" made of wire fencing and then issues warehouse receipts against woolens entrusted to it and placed in this enclosure. Limited and Tip Top decided to secure Limited in this manner.
The meeting on October 9th, at which the payments were made, lasted until late in the afternoon or early in the evening. The next morning, Mr. Terry, Limited's storekeeper who had come from Canada to aid Dunkelman in his investigation, went with representatives of Tip Top to Linden and picked out and set at one side $30,000 worth of woolens as security for Limited. As the manufacturing and all the woolens were to be transferred to Spiotta's plant in Newark as soon as possible, no steps were taken to erect the warehouse at Linden. A trucking strike delayed matters for a while, but within a few days, the actual removal to Newark took place. On Tuesday, October 15th, the lease to the warehouse company, the Lawrence System, was executed. The warehouse was then built and on October 21st, the woolens which had been selected, were placed in it and warehouse receipts issued to Limited.
The complainant says first that upon the deposit to the credit of Tip Top in the Canadian Bank of Commerce of $18,000 on October 4th, and $10,000 on October 9th, these sums became part of the general assets of the debtor and that the payment from this account to Limited, October 9th, *Page 235 
was a voidable preference. In my opinion, these funds did not, by this deposit, become part of the debtor's general assets. They were put in the bank account for a specific purpose or trust, and could not be used otherwise by Tip Top without a breach of faith. They could not be used at all without the concurrence of Limited indicated by the signature of its president on each check. The check to the order of Limited merely repaid to that company its own money.
The trustee further argues that although the promise to give a pledge was made at the same time the $19,900 was advanced on October 9th, yet not until October 21st when the warehouse receipts were issued, was the pledge perfected as required by section 60a of the Bankruptcy Act (U.S.C.A. tit. 11 § 96a); that for twelve days Limited was an unsecured creditor and hence that the security was given for an antecedent debt. CornExchange National Bank v. Klauder, 318 U.S. 434; 63 S.Ct. 679.
The proofs show, however, that Terry, Limited's storekeeper from the time the goods were segregated in Linden, watched them. "I didn't want them to disappear on us." His presence was notice of his employer's title. The lien was valid against this contention of the trustee.
The trustee also asserts that the pledge was in effect a chattel mortgage void under the New Jersey Chattel Mortgage Act,R.S. 46:28-5, because there was no immediate delivery and change of possession of the merchandise. I find that there was such delivery and a sufficient compliance with the statute. AvonChair Co. v. Essex, c., Corp., 131 N.J. Eq. 448.
But a more difficult question arises under section 67d(3) of the Bankruptcy Act (U.S.C.A. title 11 § 107d(3), which is part of the Chandler Act, inserted in the statute in 1938. This enacts that every transfer made and every obligation incurred by a debtor within the four months is fraudulent "if made or incurred with intent to use the consideration obtained for the transfer or obligation to effect a preference to a third person, voidable under section 60 (U.S.C.A., § 96). * * * Provided, however, that the trustee shall be entitled to only one satisfaction with respect thereto." Subsection *Page 236 d(6) further provides that such a transfer shall be void against the trustee except as to "a bona fide purchaser lienor or obligee for a present fair equivalent value, provided, however, that such purchaser lienor or obligee, who without actual fraudulent intent, has given a consideration less than fair, as defined in this subdivision (d) for such transfer, lien or obligation, may retain the property, lien or obligation as security for repayment." Counsel are unable to find cases construing this part of the statute. See, however, 4 Coll.Banker. (14th ed.) 306.
The major part of section 67d and much of the phraseology is taken from the Uniform Fraudulent Conveyance Act, but subsection 3 has a different source. Before the enactment of the Chandler Act, transfers to third persons who supplied the funds to effect preferences, were attacked on the theory of an intent to hinder, delay and defraud creditors. In order to invalidate the conveyance, it was essential to show actual fraud on the part of the debtor, to wit, that he intended not only to pay some of his creditors, but to defraud others. And it was also necessary to prove that the transferee participated in the fraudulent scheme.Coder v. Arts, 213 U.S. 223; 29 S.Ct. 436; Van Ideratine v.National Discount Co., 227 U.S. 575; 33 S.Ct. 343. The rule was further developed in Dean v. Davis, 242 U.S. 438;37 S.Ct. 130. "Where the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated." Payment in full to one creditor reduces the amount available to other creditors of the same class. "The lower courts were justified in concluding that he (the debtor) intended the necessary consequences of his act, * * * and that Dean (the transferree) who, knowing the facts, co-operated in the bankrupt's fraudulent purpose, lacked the saving good faith."
Subsection 3, coupled with subsection 6, is a codification ofDean v. Davis, although with some modifications. SeeAnalysis of H.R. 12,889, 74th Cong. 2d Sess. (1936) 216;House Hearings on H.R. 6439, reintroduced as H.R. 8046, 75 Cong.1st Sess. (1937) 208. The trustee in bankruptcy must prove that the debtor actually intended to use the proceeds *Page 237 
of the transaction to effect a voidable preference — that is, being insolvent, to make a transfer to a creditor which would enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. While the trustee must show that the favored creditor had probable cause to believe the debtor was insolvent, he need not prove, I am satisfied, that the debtor knew that the creditor had such cause. But it is vital that the debtor intended that the creditor should obtain a greater percentage of his debt than other creditors of the same class. The person who advances the money can defend on the ground that he is a bona fide purchaser — that is, that he was unaware (or, perhaps, had no notice) of the debtor's intent, or some essential feature of it. Although the word fraud is not used in subsection 3, yet the object of attack is the combination of debtor and third person to deprive creditors of their just share of the estate in fraud of the Bankruptcy Act.
Turning to the case before me, Tip Top had notice of its own insolvency; it intended that the consideration for the pledge of the woolens would be used to pay Allied and Dominion; it knew that Dominion, if a creditor at all, was a general, unsecured creditor, and it must be taken to have intended the necessary consequences of the payment to Dominion, namely, that other creditors would obtain a smaller percentage of their debts than Dominion. Limited was fully cognizant of the situation. It follows that the lien on the woolens to the extent of the payment to Dominion must be set aside.
The payment to Allied is on a different footing. That creditor asserted — and still asserts — a lien on property worth much more than the debt. All the parties, guided by their lawyers, acted on the basis that the lien was valid. If I am correct as to the law, Allied had no lien, but this circumstance does not affect the good faith of the parties. The presumption that everyone knows the law, is not enough in this instance to show fraud. I am satisfied that Tip Top did not intend Allied to obtain a larger proportion of its debt than other creditors of the same class. Limited's lien is good for the sum of $10,750 paid Allied on October 9th. *Page 238 
The first payment to Allied, namely, $6,000 on October 4th, was made with funds of Limited advanced without any lien. The primary question in such a case is whether the moneys used to pay the favored creditor, had become assets of the bankrupt. If not, the only effect of the transaction is to substitute Limited for Allied as a creditor to the extent of $6,000, and other creditors are not injured and no voidable preference occurs. Where the debtor controls the transaction, where he obtains a loan from the third party and names the creditor to be paid and the third person merely follows his instructions, the third person is considered the debtor's agent, and the payment is made out of the debtor's funds. Conversely, where the third party controls the transaction, the money is not regarded as part of the debtor's general assets and there is no preference. If the moneys are not paid directly by the third person to the creditor but go through the debtor's hands, they become part of the debtor's assets unless they reach him only on condition or trust that they be paid out to the creditor whom the third party has chosen. In such case, they do not become part of the assets. Sokol v. FidelityUnion Trust Co., 136 N.J. Eq. 276; 138 N.J. Eq. 429; Smyth v.Kaufman, 114 Fed. Rep. 2d 40; 130 A.L.R. 951, and cases cited in the annotation. It is entirely clear in the present instance, that Limited controlled the negotiations on the part of Tip Top with the Hiltons. Its president, Mr. Dunkelman, made all the decisions. This $6,000 never belonged to Tip Top. The payment of it to Allied was not a voidable preference.
Before Limited on October 9th paid $10,750 to Allied, it insisted upon, and obtained, a lien from Tip Top to secure the advance. The money which was paid was the consideration for the pledge, and must be considered assets of the debtor Tip Top, even though Limited controlled the transaction. This payment effected a voidable preference.
Limited advanced $9,150 to Dominion the same day upon a pledge from Tip Top which I have found is void as against the trustee. This money was assets of Tip Top, since the pledge was good as against Tip Top, though not as against the trustee. There were contractual relations between the *Page 239 
Dominion and Tip Top, relating to the capital stock of Allied and the capital stock of Tip Top, but neither the cancellation of the contracts nor the assignment to Tip Top of 400 shares of the latter's common stock, nor anything else in the case, was a present fair consideration for the payment of $9,150. Dominion was able to exact this sum because, without its consent, no settlement could be made between Allied and Tip Top. The payment to Dominion must be avoided.
The transfer from Tip Top to Dominion of the debt due from Allied was also a voidable preference.
There are equities between the defendants Dominion and Limited that should be settled in this suit. Both the payment of $9,150 to Dominion and the pledge to Limited securing the same sum are voidable, but the trustee cannot recover from both parties. The pledge has been liquidated and the proceeds are held awaiting the conclusion of this suit. The overriding interest of the estate requires that the trustee take the sum in question from the fund at hand, rather than attempt to collect it from Dominion. Thus the burden will fall in the first instance on Limited. Should Dominion be required to share the burden? Counsel on the one side press upon me that Limited was trying to rescue Tip Top, while Dominion was ruthlessly driving it into bankruptcy. And on the opposite side, that Limited voluntarily bought off Dominion in hope of saving its own investment in its subsidiary. One fact stands out — the settlement with Dominion was agreed upon before there was any thought that Tip Top should give Limited security, and Dominion had nothing whatever to do with that part of the business. The equities between Dominion and Limited are the same as if Limited, with its own funds and without security, had paid Dominion, just as it paid the sum of $6,000 to Allied. It is entitled to subrogation to any claim of Dominion against the estate, as a general creditor, up to the sum of $9,150, but exclusive of Dominion's claim for damages relating to the shares of Allied stock. Whether or not Dominion has any valid claim is a question which does not concern Chancery.
A number of creditors agreed to subordinate their debts to the claim of Limited arising out of the advance of $6,000. *Page 240 
They also encouraged Limited and the other defendants to enter upon the whole transaction which is the basis of this suit. Therefore, say the defendants, such creditors are estopped from profiting by the upsetting of the transaction, in whole or in part. Limited petitions the court to open the proofs in order to present more testimony on the subject. It would perhaps be enough to state that these creditors are not parties to the cause and therefore no decree adjudging that they are estopped can be made herein. But even if they were parties, this court could not act upon the alleged estoppel. An agreement by certain creditors to subordinate their debts to the claims of other creditors, or conduct that has the same result in equity, does not impair the title of the trustee to attack a preference or to recover assets of the bankrupt. It only affects the distribution of the estate and that is business for the bankruptcy court. Byrd Sons v.Tobin, 78 Fed. Rep. 2d 371; St. Louis Union Trust Co. v.Champion, c., Co., 109 Fed. Rep. 2d 313; Bank of America
v. Erickson, 117 Fed. Rep. 2d 796. The matter is outside the jurisdiction of any other court. Pepper v. Litten,308 U.S. 295; 60 S.Ct. 238.