### In re AMERICAN PROPERTIES, INC., Debtor.

### In re COLEMAN AMERICAN MOVING SERVICES, INC., A Nebraska Corporation, Debtor.

### COLEMAN AMERICAN MOVING SERVICES, INC., A Nebraska Corporation, and American Properties, Inc., Plaintiff,

### v.

### The FIRST NATIONAL BANK AND TRUST COMPANY OF KEARNEY, NEBRASKA, Defendant.

Bankruptcy Nos. 80–40156, 80–40158. Adv. No. 81–0018.

United States Bankruptcy Court, D. Kansas.

Sept. 28, 1981.

Eileen Hiney and R. Pete Smith of McDowell, Rice & Smith, Chartered, Kansas City, Kan., for debtors-in-possession.

Jerrold L. Strasheim of Venteicher, Strasheim & Laughlin, P. C., Omaha, Neb., for defendant.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

In this chapter 11 proceeding, the debtors-in-possession seek to avoid transfers made in a complicated transaction on the grounds the transfers were fraudulent and preferential.

The defendant, The First National Bank and Trust Company (FNB) of Kearney, Nebraska, denies the transfers were fraudulent and preferential and seeks to have its claim allowed as secured.

The issues for determination are:

1. Was property of the debtors transferred within the meaning of 11 U.S.C. § 547(b), and was the transfer a preference.

2. Was there actual intent to hinder, delay or defraud creditors within the meaning of § 548(a)(1) and was the transfer fraudulent.

3. What remedies are imposed if certain portions of a tripartite transaction are preferential and other portions are fraudulent.

The proceeding was tried to the Court in May, 1981. Thereafter both parties submitted legal memoranda and the matter is ready for resolution.

## FINDINGS OF FACT

On March 5, 1980 the debtors-in-possession filed chapter 11 petitions in this Court. Within 90 days of March 5, 1980, the transactions giving rise to this litigation culminated in the signing of notes and the giving of a real property mortgage in favor of FNB by American Properties, Inc. (American), a loan of funds by FNB and the cancellation of debt from Coleman American Moving Services, Inc., of Nebraska (Coleman Nebraska) to FNB.

Coleman Nebraska and American are wholly owned subsidiaries of Coleman

American Companies, Inc. (Companies). Coleman Nebraska is an operating company generating revenue through sale of moving and storage services. American is a company formed to hold title to corporate real property. As the term has been used in these proceedings, American is not an operating company, i. e., it does not generate funds through conduct of the moving and storage business or other now discontinued sidelines of Companies but merely holds title to realty and collects and disburses funds necessary for service of mortgages existing on that realty.

In November, 1980 Coleman Nebraska owed FNB approximately $126,000 in principal on three unsecured defaulted promissory notes. Two of the notes totaling approximately $118,000 bore interest at the rate of 10% per annum and were renewals of past similar notes. One note totaling $7,612.89 in principal was an original note arising out of and executed at the time of payment of interest on the last renewal of the other two notes.

FNB was concerned about the default and realized Coleman Nebraska was insolvent. FNB's president, Richard Fritz, contacted James Coleman, president of Companies and American and vice-president of Coleman Nebraska, to discuss payment and/or obtaining security for Coleman Nebraska's outstanding obligation. By agreement Fritz and the president of the related Nebraska bank met with James Coleman and an officer of the City National Bank of Dothan, Alabama (CNB) in Dothan, Alabama. CNB, a financing bank of Companies and its subsidiaries, had a covenant with American whereby American was prohibited from encumbering its realty without the consent of CNB. CNB was also the repository of the consolidated checking account of the Coleman subsidiaries. During the discussions that ensued, CNB agreed to waive its covenant with American in favor of FNB should FNB furnish American consideration for the imposition of a mortgage in favor of FNB. According to CNB's understanding, American would obtain a new $75,000 loan from FNB at 10% interest and an existing debt in the amount of $126,000 would be refinanced at 7%. Both loans were to be amortized over 13 years and were to be secured by a mortgage on real property owned by American in Topeka, Kansas. Lest one be amazed at the altruism of CNB, it should be pointed out that CNB was to receive $30,000 of the $75,000 loan to satisfy an obligation owed by Coleman American Moving Services of Alabama (Coleman Alabama), another subsidiary of Companies.

It appears that during the negotiations Mr. Fritz of FNB designed the following transaction. FNB was to loan new cash in the amount of $75,000 to American. In addition FNB would loan American an additional sum of money which sum was ultimately agreed upon as $136,499.63. Coleman Nebraska would then pay FNB $136,499.63 and thereby extinguish its obligation to FNB. Thus FNB would no longer have an insolvent Coleman Nebraska as an unsecured debtor but would have an obligation from American secured by a third mortgage in the amount of $211,499.63 on real property purportedly worth enough to satisfy all mortgages.

The manner in which the transaction actually occurred and was known to have occurred by the parties is as follows:

*December 17, 1979*: FNB computed the interest on the three overdue notes of Coleman Nebraska. The principal and interest due as of that date was $136,499.63.

Larry Henderson, an officer of Coleman Nebraska, signed and delivered three checks on the corporate account at CNB to FNB. These checks, numbered 34544 in the amount of $20,044.80, 34545 in the amount of $108,111.11, and 34546 in the amount of $8,343.72, for a combined total of $136,499.63, were then deposited and placed into normal banking channels.

*December 18, 1979*: Douglas Coleman, vice-president of American, executed two promissory notes on behalf of American in favor of FNB. One note was in the amount of $126,153.82 and bore interest at 7%. The second note was in the amount of $85,345.81 and bore interest at 10%. A third mortgage

in the amount of $211,499.63 was executed on the Topeka property in favor of FNB. FNB wire transferred $75,000 to American in care of CNB. Coleman Alabama's $30,-000 debt to CNB was immediately paid.

*December 24, 1979*: The three Coleman Nebraska checks arrived at CNB. CNB, as per the instructions of FNB, telephoned FNB to inform them the checks had arrived through banking channels. FNB immediately wire transferred $136,499.63 to American care of CNB. By prearrangement the money was placed in the subsidiaries' joint account. The checks drawn on the account in favor of FNB in the amount of $136,-499.63 were honored by CNB.

Through an intercompany bookkeeping entry made at some later date, Coleman Nebraska was shown to owe American $136,499.63.

James Coleman willingly entered into this transaction. He believed it to be overly complicated but wished to receive the fresh cash of $75,000 and obtain an extension on the repayment of Coleman Nebraska's debt to FNB. He was not concerned with the methodology by which the fresh cash and extension were obtained. He was aware that Coleman Nebraska did not have the present ability to pay its $136,499.63 obligation and was aware that the transaction could adversely affect American creditors since they received in exchange for a $211,-499.63 mortgage on real property $75,000 in cash, some of which paid another subsidiary's obligation to CNB and an intercompany receivable from insolvent Coleman Nebraska. He did not, however, have a conscious intent to hinder, delay or defraud creditors though factually such a result can be drawn.

FNB through Richard Fritz, its president, and Richard Harbaugh its vice-president and loan officer for this transaction, was aware that Coleman Nebraska was insolvent. It was this knowledge that led FNB to Dothan, Alabama seeking security for its outstanding loan. The bank devised the methodology for the loan transaction. It was aware that the various Coleman subsidiaries shared an account at CNB. It was

aware that the amount it wired to CNB on December 24, 1979 was the amount necessary to the penny to cover the checks written it by Coleman Nebraska on December 17, 1979. It was the intent of FNB to ensure that the checks of Coleman Nebraska to it be honored, which admittedly was the reason for the delay in disbursing loan proceeds purportedly generated and on which interest began running on December 18, 1979. It was admittedly not normal banking practice to withhold funds in this manner once a loan was made and security obtained.

## CONCLUSIONS OF LAW

Under § 1107(a), the debtors-in-possession are authorized to exercise a trustee's avoiding powers under § 547 and § 548. At the outset it is important to note:

> *The trustee's avoiding powers are those given him to avoid and set aside transfers made and obligations incurred by a bankrupt or debtor which violate the bankruptcy law's basic policy of effecting a fair and equal distribution of the debtor's assets among his creditors.* *Teofan and Creel, 'The Trustee's Avoiding Powers Under the Bankruptcy Act and the New Code: A Comparative Analysis,' 11 St. Mary's L.J., 311 (1979) (emphasis added;*

*Preferential Transfer Between Coleman Nebraska and FNB.*

Under § 547, a transfer can be avoided if:

1. property of the debtor is transferred to or for the benefit of a creditor;

2. the transfer was made for or on account of an antecedent debt;

3. the debtor was insolvent at the time of the transfer;

4. the transfer was made on or within 90 days before the date of the filing of the bankruptcy petition; and,

5. the transfer has the effect of increasing the amount the transferee receives in excess of entitlement in a chapter 7 proceeding.

In the transfer between Coleman Nebraska and FNB, there can be no question Coleman Nebraska was insolvent [the parties have stipulated to Coleman Nebraska's insolvency, and see § 547(f)]; the transfer was made within 90 days of the filing of the bankruptcy petition and the transfer, which enabled a previously unsecured creditor to receive *the full amount owing*, was more than the amount FNB would receive in a chapter 7 proceeding. In addition, the transfer was made in part to satisfy a past due obligation of *Coleman Nebraska* and therefore was on account of an antecedent debt.

The only issue is whether property of Coleman Nebraska was transferred. FNB argues there was no transfer because the funds paid by Coleman Nebraska were "earmarked" funds of American Properties which American Properties gave to Coleman Nebraska for the express purpose of paying Coleman Nebraska's creditor, FNB. As authority for this rule, FNB cites 4 Collier on Bankruptcy, ¶ 547.25 (15th Ed. 1981):

> *A transfer of money or property by a third person to a creditor of a debtor, that does not issue from the property of the debtor, ... is not a preference ... In cases when a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly 'earmarked' ... Id. at 547–92 to 97.*

Accord, *Inter-State National Bank of Kansas City v. Luther*, 221 F.2d 382, 393 (10th Cir. 1955), cert. denied, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823; *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70, 72 (2nd Cir. 1938); *Bank of American Natl. Trust & Savings Assn. v. Small*, 67 F.2d 140, 141 (9th Cir. 1933); *First National Bank of Danville, Ill. v. Phalen*, 62 F.2d 21, 23 (7th Cir. 1932); *Citizens National Bank of Gastonia, N.C. v. Lineberger*, 45 F.2d 522, 525 (4th Cir. 1930); *Crosby v. Packer*, 22 F.2d 611, 613 (1st Cir. 1927); *Miller v. Wells Fargo Intl. Corp.*, 406 F.Supp. 452, 463, n. 2 (S.D.N.Y.1975); *Stone v. Allied Clothing Corp.*, 140 N.J.Eq. 224, 54 A.2d 625, 634–35 (1947); *Chiarovano v. Buttnick*, 57 Wash.2d 542, 358 P.2d 305, 307 (1961).

█ This Court agrees with the rule as enunciated in Collier and these cases, but finds it inapplicable to the facts of this case. Though the transaction on paper involved a transfer from American to Coleman Nebraska, the actual transaction did not involve an intercompany transfer. Three checks were drawn by a Coleman Nebraska officer to the order of FNB *before* any money was transferred to Coleman Nebraska and FNB computed the interest due it as of receipt of the checks, not on the following day when the loan was made to American or seven days later when FNB wired money to the Coleman joint account. When money was finally transferred to Coleman Nebraska, it did not come from American, but rather came from FNB. Furthermore, even if the transaction was carried out as it was set out on paper neither the Collier rule nor any of the cases cited by FNB as support for the Collier rule deal with a situation where the creditor begins the transaction by transferring the money for eventual repayment to itself. In such a situation, there is a transfer by the debtor within the meaning of § 101(40) whether "direct or indirect," because where the creditor transfers the money for eventual repayment to itself:

> *courts of Bankruptcy from the beginning placed emphasis upon the purpose and effect of a given transaction irrespective of the devious manner in which it was accomplished. Before long the principle became well established that a transfer, which indirectly evaded the provisions of the Act by effecting an undue preference to a creditor, was voidable. 4 Collier on Bankruptcy, 547.09, at 547–33 (15th Ed. 1981).*

Thus, even if $136,499.63 had been advanced to American Properties, payment by Coleman Nebraska to FNB could still be a preferential transfer. Of course, $136,-499.63 was not really advanced to American Properties. Rather Coleman Nebraska wrote three checks to the order of FNB. Those checks represented a transfer of Coleman Nebraska's property and the final element of a preferential transfer is met. This Court therefore finds the transfer of funds from Coleman Nebraska to FNB a preferential transfer under § 547. This Court also finds that because American Properties owed nothing to FNB before this transaction, there was no antecedent debt and no preferential transfer between American Properties and FNB.

*Fraudulent Transfer—Transfer Between American Properties and FNB.*

Under § 548(a)(1), a transfer can be avoided if:

> *. . . the debtor—*
> *(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted*
> *. . .*

In *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), a bank called in $1,600 in unsecured, unpaid loans owed by Jones. If Jones could not pay the obligation to the bank, he feared he would be arrested and criminally prosecuted because of certain forged endorsements on the notes. Jones therefore convinced his brother-in-law Davis to loan him $1,600. Davis agreed to make the loan and took a security interest in essentially all real and personal property owned by Jones. Jones, however, could not pay the loan obligation to Davis as it became due because he was insolvent, and declared bankruptcy. Davis claimed all the mortgaged property as a secured creditor but was challenged by the trustee at the behest of Jones' other general creditors. The Court, by Justice Brandeis, said in a landmark decision:

> *A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act 'hinders, delays or defrauds creditors' within the meaning of § 67e . . . Id. at 444, 37 S.Ct. at 131.*

The Court said Dean was not a purchaser in good faith because he knew the circumstances surrounding the transaction—he knew Jones was insolvent and knew Jones willingly sacrificed his property and his other creditors to avert a threatened criminal prosecution—and *knowing the facts, cooperated in the bankrupt's fraudulent purpose, [and thus] lacked the saving good faith. Id. at 445, 37 S.Ct. at 132.*

Thus *Dean v. Davis* is a warning to creditors who loan money to a debtor and take a security in the debtor's property, knowing the loan will be used by the debtor to pay off an unsecured creditor. *Dean v. Davis* holds such a loan is a fraudulent transfer and will not be honored if a debtor declares bankruptcy. Congress attempted to codify the holding of *Dean v. Davis* in section 67(d)(3) of the Act. Though this section has been eliminated under the Code, the holding of *Dean v. Davis* is still reflected in Code § 548(a)(1) and commentators have said:

> *No doubt the courts will reach a similar result should similar facts arise again, even in the absence of Bankruptcy Act 67d(3). Levin, An Introduction to the Trustee's Avoiding Powers, 53 Am.Bankr. L.J. 173, 183 (1979). Accord, P. Murphy, Creditor's Rights in Bankruptcy, 11.04 (1980). Brody, Practicing Under the Bankruptcy Reform Act, 150 (1979).*

The Court finds *Dean v. Davis* an applicable precedent in applying § 548(a)(1).

■ Clearly, the instant transaction between FNB and American is a transaction within § 548(a)(1). Though there are more parties involved, the purpose of FNB's scheme was to pay off an unsecured debt and create a secured debt. In *Dean v. Davis* one creditor was substituted for another. In the instant case, one debtor was substituted for another, but the results are the same. Certainly the inference of knowledge by the creditor must be very

great where the creditor orchestrates a scheme to "pay off" its unsecured claim and substitute a secured claim. This Court finds the instant transaction to be a fraudulent transfer under § 548(a)(1).

FNB argues § 548(a)(1) requires a finding of actual intent to hinder, defraud or delay the creditors of the debtor and because James Coleman did not have any overt intent to hinder, delay or defraud the creditors of American, there can not be a fraudulent transfer. The Court does not agree. As Justice Cardozo said in finding an intent to hinder, delay or defraud creditors under the fraudulent transfer provision of the Bankruptcy Act:

> Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather the financial storm, and pay his debts in full . . . The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay. Shapiro v. Wilgus, 287 U.S. 348, 354 [53 S.Ct. 142, 144, 77 L.Ed. 355] (1932).

Furthermore,

> (S)ince section 548(a)(1) requires an actual intent to hinder, delay or defraud, its application cannot be mechanical. As Judge Hough so aptly said:
>
> > The elements productive of that intent . . . can never be defined. They vary as do facts, and any judge or jury, dealing with facts by some rule of thumb, will always miss the human touch. Testimony can never be tested or weighed by machine. [Richardson v. Germania Bank, 263 F. 320 (2nd Cir. 1919), cert. denied 252 U.S. 582, 40 S.Ct. 393, 64 L.Ed. 727 (1920).]
>
> But courts, guided by common commercial knowledge and practices, awakened to the ingenuity of fraud, yet faithful to the requisite of actual intent, can forge section 548(a)(1) into an effective instrument against fraud in fact. 4 Collier on Bankruptcy 548.02 at 548–40 to 41 (1981).

Here, the parent company and a group of subsidiary moving companies were desperately trying to weather a financial hurricane. With a well founded belief that extending repayment of the debt of Coleman Nebraska would help weather the storm, and with full knowledge that the transaction as proposed would be detrimental to the creditors of American, nevertheless James Coleman on behalf of the Coleman Companies, intentionally entered into the transaction and transferred a mortgage from American to FNB. There was no element of malice towards the creditors of American because James Coleman genuinely hoped the storm would pass. The transaction was not entered into in an attempt to harm American's creditors but the transaction was entered into intentionally, to satisfy a Coleman Nebraska debt and with full knowledge harm would come to the creditors of American, hindering or delaying the ability of these creditors to receive satisfaction of debts owed to them by American.

The Court finds full knowledge of the effect of this transaction on the creditors of American and Companies and despite this knowledge, the intentionally carrying out of the transaction, to be "actual intent" to hinder, delay or defraud creditors within the meaning of § 548(a)(1), and finds the $136,499.63 transaction a voidable transfer under § 548(a)(1).

As to the $75,000 portion of the transfer, American used part of that advance to pay off its secured creditor CNB. There could be no actual intent to hinder, delay or defraud creditors because American granted a mortgage and received a loan in order to satisfy an obligation of its existing secured creditor. Therefore the Court finds the portion of the mortgage securing the $75,000 advance is not a fraudulent transfer.

Remedy.

Having determined the transfer between Coleman Nebraska and FNB was preferential, and the transfer between American and FNB was fraudulent, the Court must provide for a remedy. In a normal preference, the transfer is avoided, the creditor's claim is restored as it existed before the transfer, and if money or property were transferred, they are returned to the estate, or the debtor-in-possession. See §§ 544(a),

547, 550 and 551. In the instant case this would mean Coleman Nebraska would recover $136,499.63 from FNB and FNB would retain an unsecured claim of $136,499.63 against the debtor-in-possession.

In a fraudulent transfer, as in *Dean v. Davis*, the secured lien would be extinguished thus unencumbering the estate's property. In the instant case this would mean the mortgage granted by American in the amount of $136,499.63 would be extinguished.

Because FNB chose to carry out this transaction in such a manner in an attempt to sidestep the provisions of § 547 and § 548, a curious result could occur. Before the transaction, FNB loaned a sum of money and was owed an unsecured $136,499.63 as a result thereof. After the transactions are avoided, FNB could be required to pay $136,499.63 back to Coleman Nebraska (the preferential transfer), making its total amount "advanced" $272,999.26, but leaving a filed unsecured claim for $136,499.63 and an additional unsecured claim to be made of $136,499.63.

Thus, in order to obtain security for its unsecured debt from an insolvent FNB could have doubled its exposure as an unsecured creditor of insolvents.

*Oh, what a tangled web we weave,*
*When first we practice to deceive!*
*Sir Walter Scott*

To cause FNB to become doubly unsecured, however, is not the answer to this transactional maze.

The Court must look at what really occurred in this transaction and decline *to debate in artificial terms the matter to be considered. McWilliams v. Edmonson,* 162 F.2d 454, 455 (5th Cir. 1947). Viewing the transaction either the way it was orchestrated on paper or in reality, the fact is the bank advanced $136,499.63 and received back the same $136,499.63. The $136,499.63 portion of the transaction was a "wash," a nullity, a sham. The only portion of the transaction which had any substance to it was the $75,000 advance to American in return for which FNB received a mortgage on American's Topeka terminal.

This Court holds the FNB-Coleman Nebraska transfer was preferential, and the FNB-American transfer was fraudulent, but also recognizes in looking at the substance of the transaction that only the $75,000 advance to American really occurred, the remainder being illusory. The Court orders the following: all transfers related to the $136,499.63 portion of the transaction are avoided; FNB retains the same unsecured claim against Coleman Nebraska in the amount of $136,499.63 that it had before this transaction occurred; FNB is not required to return $136,499.63 to Coleman Nebraska or the debtors-in-possession because in substance, although a preferential transfer, the transfer was a "wash," a nullity, and a sham; the $75,000 portion of the transfer to American was neither preferential nor fraudulent, and therefore FNB has a secured claim against the debtors-in-possession as represented by the mortgage granted by American in the amount of $75,000.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.