**In re EMB ASSOCIATES, INC., Max Sugarman Funeral Home, Inc., Debtors.**

**Jason MONZACK, Trustee Plaintiff,**

v.

**ADB INVESTORS, Bristol Associates, Inc. and Dade Service Company, Defendants.**

Bankruptcy Nos. 8200568, 8200569. Adv. No. 820405.

United States Bankruptcy Court, D. Rhode Island.

Oct. 21, 1988.

Z. Hershel Smith, Di Sandro–Smith Associates, Providence, R.I., for trustee.

Robert D. Wieck, Adler, Pollock & Sheehan, Providence, R.I., for ADB Investors.

David J. McOsker, McOsker, Isserlis & Davignon, Providence, R.I., for Bristol Associates, Inc. and Dade Service Co.

## DECISION

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

After years of posturing, this 1982 litigation was finally heard on April 18, 19, 28, and May 17, 1988, on the Trustee's complaint to recover, as a preferential transfer and as a fraudulent conveyance, property of Max Sugarman Funeral Home, Inc., to ADB Investors [1] (hereinafter "ADB"), and for "other appropriate relief." This additional relief, as it was jointly addressed by the parties at the hearing, has emerged as a request for equitable subordination of ADB's claim to the unsecured claims of the debenture holders of the debtors, EMB Associates, Inc. and Max Sugarman Funeral Home, Inc.

## BACKGROUND

The relevant facts which led up to and resulted in the various transfers in question are as follows: [2] In March 1970, EMB Associates, Inc. (hereinafter "EMB") purchased from the Sugarman family, the real estate at 458 Hope Street, Providence, Rhode Island, where the Max Sugarman Funeral Home (hereinafter "SFH") had been operated since the 1930's. At the same time, EMB acquired all of the stock of the Max Sugarman Funeral Home, Inc., which was the operating company for the business. The total purchase price for the real estate and the stock was approximately $1,200,000. EMB Associates, Inc. is a corporation whose original principals were Erwin M. Bosler, Roy Lehrer, and Robert B. Goldblatt. Bosler, Lehrer and Goldblatt, collectively, contributed $75,000, and they borrowed an additional $350,000 from acquaintances and friends, to make up the $425,000 deposit. The balance of the pur-

---

1. Many of the claims against Dade Service Company, Inc. were addressed and decided in the Judgment entered by this Court on December 30, 1987. All other claims against Dade were dismissed with prejudice under the same Order. The claims against Bristol Associates, Inc., which were not pressed at the trial, are dealt with in this decision as a result of the interwoven nature of the facts involved.

2. This opinion constitutes our findings of fact and conclusions of law. *See* Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

chase price, approximately $775,000, was financed by the sellers, the Sugarman family, who retained a first mortgage on the real property. Thus, the start-up capital that the principals put into the purchase of the property, the business, and the stock, was only 6.25% of the purchase price.

Just seven months after the sale, in October 1970, EMB borrowed $300,000 from the Rhode Island Hospital Trust National Bank, guaranteed by the Small Business Administration (hereinafter "SBA loan") (Trustee's Exhibit No. 15), to pay back most of the money borrowed from friends of the principals.[3]

Shortly thereafter, it became obvious that the income from the operation of the funeral home was not sufficient to keep the business going and to pay both the SBA loan and the mortgage to the Sugarman family, and that the SFH would be needing large amounts of additional money from other sources, on a long term basis, in order to meet its fixed obligations. This was accomplished initially through the offering and sale, by Erwin Bosler, of Max Sugarman Funeral Home debentures to private investors. Said debentures provided for interest of 13% per annum, 1% payable on the first day of each month, with an additional 1% on each "annual" anniversary date, and they matured at face value five years after the date of issue. From 1970 to 1982, a total of $1,854,000 was raised through the sale of debentures to 85 different investors. The majority of these, approximately 60%, were sold between 1978 and 1982, when the financial condition of the business had worsened dramatically.

Alan D. Brier, an accountant, was a long time acquaintance of Erwin Bosler, who was also a public accountant before he went into the funeral business. When Bosler became one of the purchasers of the SFH in 1970, Brier took over Bosler's general accounting practice, and at the same time, he also became the accountant for the

funeral home, and remained in that capacity throughout the long period of the decline of the business.[4] In 1973, after the SFH had been his client for three years, and in response to the funeral home's continuing financial shortfalls, Brier formed a limited partnership, called ADB Investors, in which he was the general partner. The partnership was formed specifically to provide financing to the ailing funeral home, in the total amount of $450,000. Explicitly, a loan agreement was entered into between the SFH and ADB Investors (Brier), upon the following terms: Advances were to be made by Brier in installments, in accordance with a schedule attached to the agreement, (*see* Plaintiff's Exhibit No. 20); the total indebtedness of EMB, including the debt to ADB, was not to exceed $1,000,000; and any borrowing in excess of the debt ceiling would be subordinated to the debt of ADB. The million dollar limit represented what Brier believed was the maximum amount of debt that the business could reasonably support, based on alleged operating profits of approximately $100,000 per year. ADB also loaned EMB an additional $48,000, concurrently with the $450,000 loan agreement, bringing the total financing package to $498,000. For each advance made by ADB, Brier received a "commission" of between three (3%) percent and five and one-half (5½%) percent, as set forth in Schedule A of the loan agreement. Thus, for the $450,000 to be advanced, Brier was to receive $18,000 in "commissions," which represents four (4%) percent of the total loan. Interest on the ADB loan accrued at a variable rate equal to the greater of twelve (12%) percent per annum, or two (2%) percent over the prime interest rate set by the Industrial National Bank of Rhode Island. Interest was to be paid quarterly, in arrears, beginning three months after the first advance. The total interest to be paid pursuant to the loan agreement was $191,940. Therefore, on a loan of $450,000, Brier was to receive

---

**3.** Of the three original principals, only Erwin Bosler remained in the business after 1978. Goldblatt left in 1978. Lehrer left in 1973, but returned in 1981 as Dade Service Company and Bristol Associates, Inc.

**4.** Brier remained as the accountant from 1970 until 1980, the year he negotiated the mortgage agreement with EMB and SFH to secure ADB's loan.

$209,940 in interest and commissions, which represents a 46.65% return over seven and one-half years. The amount of this profit to Brier casts suspicion on the arm's length of the dealings between ADB and EMB, from the very start. Between January 1973 and March 1980, $467,500 was advanced to EMB by ADB. As security for the loan, EMB pledged the stock of the SFH. That security interest, which later turned out to be unperfected, led to other dealings between the parties which bear heavily on the result herein. Even up to this point, the agreement weighs so heavily in favor of ADB that it requires very careful scrutiny.[5] But the most onerous part of the loan agreement is yet to come, i.e. repayment of the entire balance, in a balloon payment, on July 1, 1980! Considering the financial condition of the business, which was well known to Brier, this has to be the ultimate in building a certain default into the agreement. With that (balloon payment) provision, the result was obvious and inevitable from the outset.

During the entire seven year period when ADB was advancing money to EMB, Brier was the company accountant, and he was at the funeral home on a regular basis to review the books, and to prepare business tax returns and so-called "internal" financial statements. At all relevant times, he had complete access to the books, records, and business activities of the funeral home. The income from the sales of debentures was readily ascertainable, and the amount of interest being paid to debenture holders appeared in the check disbursement ledger, which was used regularly by Brier in his ongoing accounting activities. Based on Brier's bird's eye view of the entire operation, the conclusion is inescapable that he knew all about the business, including the debenture sales, and his protestations to the contrary are rejected.

Around the middle of 1977, sales of debentures by Bosler began to increase dramatically, in response to the growing interest due on both the multiplying ADB loan and the debentures. The SFH's income

was clearly inadequate to cover the debt service, and discussions between Brier and Bosler occurred as early as 1978 regarding the nearly half-million dollar balloon payment due on July 1, 1980. It is clear that as of that time, Brier knew that the debt ceiling was exceeded, and that a substantial amount of that debt, approximately $950,000, was owed to debenture holders. Nevertheless, he continued to make advances to EMB. Also during that same time, Brier included false interest figures and information on the 1978 tax returns he prepared for the SFH, (see Plaintiff's Exhibit No. 22). He stated that he did this at Bosler's request, to reflect a favorable financial picture of the business. Although Bosler denies making such a request, I find that at all relevant times Brier and Bosler were acting in concert to "make the company look good," so that Bosler could continue selling debentures and Brier could continue collecting his interest and commissions on advances under the ADB–EMB "sweetheart" arrangement. Through the joint actions of Bosler and Brier, the SFH was able to continue to operate from 1978 to 1982, only because of increased debenture sales, made possible through misrepresentations to investors, including false "internal" financial statements and doctored tax returns. In 1980 when the entire ADB loan became due, and when Brier learned that his own attorneys had failed to properly perfect his security interest in the stock, instead of attempting to achieve a belated perfection of his security interest, Brier insisted on and obtained a mortgage on the real estate, plus a security interest in the tangible personal property of the business, immeasurably improving his prior, present, and future positions over that of non-insiders.

On the subordination issue, the repayment structure of the mortgage taken by ADB is very significant. Because of his "insider" position, Brier knew that the net operating profit of the business was only $100,000 per year, before debt service. He

---

5. Although the loan agreement with ADB was purportedly entered into in order to pay off the Sugarman debt, what really happened was that EMB (Bosler) merely substituted one debt for another, at much higher expense to the SFH.

also knew that the SBA mortgage payment was $4,300 per month, or $50,000 per year, and that, therefore, the business could not afford to pay more than $50,000 per year on the ADB mortgage and the debentures, combined. With that information at his disposal, Brier and the debtor-to-be entered into the following schedule, which is unusual, to say the least: Payments for the first year were $2,000 per month, and then payments for the following years escalated as follows: $7,000 per month in 1981, $8,000 per month in 1982, $9,000 per month in 1983, and $10,000 per month in 1984. Based on the SFH's ten year prior track record, well known to David Brier, the likelihood that such a payment schedule could be met, after the first year, is nil. The people purchasing debentures knew nothing about all this.

Considering Brier's familiarity with the SFH's financial condition and income, his knowledge that the SFH could not obtain refinancing to make the July 1980 balloon payment, and his belated awareness that the stock pledge was unperfected, I find as a fact and conclude as a matter of law that the October 10, 1980 mortgage acquisition was not the result of arm's length negotiations between EMB and ADB, and was detrimental to the rights of creditors. Brier was completely aware of the extent of the SFH's indebtedness, and concerned over his own unsecured status, which he quickly remedied, without notice to creditors. All this supports the likelihood that the mortgage acquisition was intended (maybe with/maybe without advice of counsel) to provide ADB with the necessary time (one year) to obtain a safe secured status, even as an insider. After one year, the monthly mortgage payments were to escalate from an easy $2,000, to increasing levels which Brier knew SFH could never pay.

During 1980 and 1981, while the SFH was paying ADB its monthly $2,000 mortgage payment, Bosler continued raising money through the sale and/or renewal of debentures. These funds were being used to pay the SBA debt, the Sugarman family mortgage, ADB, interest to debenture holders, and the operating expenses of the business. Notwithstanding his denial of it, Brier is charged with and had full knowledge of the extent of these debenture sales and the fact that investors' money was then being used to pay down liens on the property which ADB now held as security under the foreclosure agreement.[6]

In October 1981, again without notice, the SFH personal property was transferred to a corporation known as Dade Service Company, and the real estate was conveyed to Bristol Associates, Inc. The principal and sole stockholder of both Dade Service Company and Bristol Associates, Inc. was and is Roy Lehrer, one of the principals in the original 1970 acquisition of the funeral home from the Sugarman family. Although Brier claims that until the foreclosure action in April 1982 he knew nothing about these transfers, based on his insider status as it appears throughout this opinion, this contention is rejected outright. Also, as previously found, Brier and Bosler, and since October 1981 Lehrer, also, were acting in concert, for their respective personal interests, with each party fully aware of what the other was doing.

Despite Bosler's protestations to the contrary, it is also crystal clear to us (as it must have been to David Brier) that Bosler continued to actively participate in the operation of the business, even after these transfers. This is evidenced by checks bearing his signature and dated after October 1981, (see Defendant's Exhibit Nos. 30–33), his own admission that he continued to sell debentures, his continuous presence at the funeral home, his attendance at the 1982 closing (in lieu of foreclosure), and the fact that he was a guarantor on the lease back from ADB to Dade Service Company. Bosler's continued involvement in the SFH after the transfer to Dade Service Company, Inc. confirms the true nature of that

6. In assessing the collective conduct of ADB (Brier), EMB, and the SFH, vis-a-vis the investors, a noticeable aspect of this "case" is the selective manner in which the friends of the principals were paid, as well as the debt to the sellers, to the exclusion and detriment of the debenture holders, who were the major source of funding for said payments.

transfer, which I find was a change in name only. Under the agreement, the consideration for the transfer was Dade's assumption of the SFH's trade accounts payable, security agreements of record, and all past obligations due Roy Lehrer. Curiously, Dade also agreed to "assume" SFH's accounts receivable and inventory. In essence, the SFH business was being turned over to Dade Service Co., Inc. largely in return for Dade's assumption of the secured debt. This transfer took place only two months after the SFH's mortgage payment to Brier jumped from $2,000 to $7,000 per month. This reinforces the fact that Bosler knew that the debtor could not meet its obligations and also lends credence to the argument that the purpose of the transfer was to place the property even further beyond the reach of debenture holders, while preserving the interests of David Brier, pursuant to his 1980 mortgage acquisition. The conveyance of the real estate by EMB Associates to Bristol Associates on the same day was also merely colorable. No consideration was recited in the deed, and again, as with the Dade Service Company, Roy Lehrer is Bristol Associates' sole stockholder. In this case, transferors and transferees were making deals as though there were no debenture holders, but the reality is that they were acting with the knowledge that there were very substantial numbers of debenture holders out there.

In April 1982, after SFH (inevitably) defaulted on one of the $7,000 monthly payments due under its year old mortgage with ADB, the parties again got together, and this time agreed to a transaction whereby a "deed in lieu of foreclosure" would be given to ADB by Bristol Associates and a "bill of sale in lieu of foreclosure" would be given by Dade Service Company to ADB. Contemporaneously, ADB leased the SFH property back to Dade Service Company for five years, with options to purchase and to renew. The stock of Dade was pledged as security for the lease to ADB, and the lease was personally guaranteed by Erwin Bosler, his

wife, Miriam D. Bosler, and his son, Lewis Bosler. The April, 1982 transfer to ADB by Dade Service and Bristol Associates reinforces our earlier conclusion that the 1981 transfer was but a pretense. Dade Service Company and Bristol Associates were not parties to the 1973 loan agreement between EMB, the SFH and ADB. Neither were they parties to ADB's 1980 mortgage acquisition and security interest in EMB and the SFH. Dade's and Bristol's acquiescence in the 1982 transfer of all their real and personal property to ADB, without question as to validity and/or amount of the obligation to ADB, suggests that the parties, ADB (Brier), EMB and SFH (Bosler), and Dade Service Company and Bristol Associates (Lehrer), had all previously agreed to this merely colorable scheme, so that Brier's position could continue to be protected and the others could continue running the business, all the while ignoring the deteriorating interests of debenture holders.

Finally, on June 13, 1982, the SFH and EMB Associates were petitioned into involuntary bankruptcy by three debenture holders. At the time of the filing of the involuntary petition, the SFH and EMB owed the debenture holders over $1,400,-000.[7]

In the present action, the Trustee seeks to have the October 10, 1980 mortgage and the 1982 transfers of the real and personal property to ADB set aside, and to have ADB's underlying claim equitably subordinated to the unsecured claims of the debenture holders. In addition, the Trustee requests that the 1982 transfers of the real estate and personal property to ADB be deemed a fraudulent conveyance and a preferential transfer, and declared void pursuant to sections 547(b) and 548 of the Bankruptcy Code.

## EQUITABLE SUBORDINATION

Section 510(c) of the Bankruptcy Code gives Bankruptcy Courts broad equitable

---

**7.** At the time of the filing, individual debenture investments ranged in amount from $1,500 to $120,500.

powers to subordinate a claim on equitable grounds, and provides in relevant part, that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

■ The fundamental aim of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791, 800 (8th Cir.1944).

"It is intended that the term 'principles of equitable subordination' follow existing case law and leave to the court development of this principle." 124 Cong.Rec. H. 11,095 (Sept. 28, 1978).

A three pronged test has been developed for a court to determine whether to exercise its power of equitable subordination:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*Benjamin v. Diamond (In re Mobil Steel Co)*, 563 F.2d 692, 700 (5th Cir.1977).

Under the first element, three general categories of inequitable conduct have been recognized: (1) fraud, illegality and breach of fiduciary duties; (2) substitution of debt for capital when a company is undercapitalized; and (3) the claimant's use of the debtor as its alter ego or instrumentality.

*Wilson v. Huffman (In re Missionary Baptist Foundation of America)*, 712 F.2d 206, 212 (5th Cir.1983); *In re Beverages International, Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass 1985).

■ The burden of proof varies, depending on the status of the claimant. "Where the claimant is an insider or a fiduciary, the Trustee bears the burden of presenting material evidence of unfair conduct." *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986); *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 714 (5th Cir.1980). Once this burden is met, the burden shifts to the claimant to prove the fairness of his conduct vis-a-vis the debtor and the other creditors. *In re N & D Properties, Inc., supra.* "If the claimant is not an insider or fiduciary, however, the Trustee must prove more egregious conduct such as fraud, spoliation or overreaching, and prove it with particularity." *Id.*

The Code defines an insider as an officer, director or person in control of the debtor. 11 U.S.C. § 101(30)(B). This definition, however, is merely illustrative, and the term "must be applied flexibly on a case by case basis." *Huizar v. Bank of Robstown (In re Huizar)*, 71 B.R. 826, 831 (Bankr.W. D.Tex.1987). *See also Castellani v. Kohne (In re Kucharek)*, 79 B.R. 393, 395 (Bankr. E.D.Wis.1987); *Hunter v. Pool Pals Manufacturing, Inc. (In re Benson)*, 57 B.R. 226, 230 (Bankr.N.D.Ohio 1986). Guidance for determining whether one is an insider is given in the legislative history: "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–314 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6268, 6271; *see also In re Kucharek, supra,* 79 B.R. at 395. Often persons are found to be insiders because they "control" the debtor. *DeRosa v. Buildex, Inc. (In re F & S Central Mfg.)*, 53 B.R. 842, 848 (Bankr.E.D.N.Y. 1985). "A creditor who does not deal at arms length with the debtor but who has a

special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider." *Id.*

Based on the foregoing references and statements regarding the principle of equitable subordination, there could hardly be a clearer case for its application than this one. As early as 1973, Brier had precisely the type of special relationship with the SFH and EMB contemplated by the Code to qualify him as an insider. Consider first, that when the 1973 loan agreement was entered into between ADB (Brier) and EMB, Brier had already served for three years as the company accountant. This background provided him with a clear picture of the financial capability of the business, and enabled him to establish a rapport with Erwin Bosler that was to be the basis for all of their future dealings. This information was especially advantageous to him during the ensuing loan negotiation process. Brier knew, for example, that EMB was unable to obtain conventional financing to pay off the Sugarman family mortgage of $775,000, and his detailed knowledge of EMB's weaknesses, early on, placed him in a superior bargaining position. His advantage is evidenced in the details of the loan agreement: Brier received, at a minimum, a 16% return per annum in commissions and interest on each advance; his total return was 46.65% at a time when the company was already heavily indebted (approximately $1,000,000); he maintained control over the amount of debt incurred by the business through the restriction on the debt limit; and finally, by the inclusion of the half-million dollar 1980 balloon payment, which Brier must have anticipated would result in his becoming the owner of the real estate.

█ The "special" relationship between Brier and EMB is even more evident, when viewed in relation to the debenture holders.

In his dual and conflicting capacities as the funeral home's accountant, and as a creditor advancing money, Brier knew by 1978 that the debt limit of $1,000,000 was exceeded. The business had borrowed, through the sale of debentures alone, some $950,000, and he knew this. In addition, Brier had advanced approximately $414,000 through ADB. He also knew that there was an outstanding balance of between $240,000 and $300,000 on the SBA loan and, although the evidence is unclear, some money still owed to the Sugarman family. It was with all of this inside information which enabled Brier to assess his own personal financial involvement with EMB, and to determine that only through the sale of more debentures would he continue to collect interest and commissions under the 1973 loan. It should also be kept in mind that during all this time, Brier considered himself secured by the stock pledge for the principal amount of his loan, and that it was not until 1980 that he learned that his security interest was never perfected. Thus, Brier's special relationship enabled him to stay abreast of the financial condition of the business at all times, and definitely enhanced his ability to decide whether and/or when to make advances. As Brier continued to loan money to the SFH, while improving his position vis-a-vis the debenture holders, whether he likes it or not, David Brier acquired a fiduciary duty to people who, unknowingly, were continuing to invest in a failed enterprise.[8] Finally, in 1980, when the expected became obvious, i.e. that the balloon payment to ADB was not forthcoming, and when Brier discovered that his stock pledge was unperfected, he was in a position to, and he did, insist on the October 10, 1980 foreclosure agreement, and thereby acquired complete domination over the debtor's financial future by instituting payment terms that were obviously designed to put the funeral home in yet another impossible position.

**8.** A crucial factual question naturally arises right at this point, i.e. if the debenture holders were privy to the same information as was available to David Brier, would they have invested, as they did? Although we do not presume to be able to give a precise answer to the question, we conclude with ease that Bosler's sales tech-

nique would not have been nearly as successful as was the case with these people who knew none of the facts, and neither would Brier have been able to collect approximately $200,000 in interest and commissions, or end up owning the property, without these continuing sales.

All of this constitutes enough control and domination to easily meet the "insider" standard. Having so concluded, it follows, that the Trustee has presented sufficient evidence of control and inequitable conduct to meet his initial burden.

"Where a creditor has taken control of the debtor, he assumes the fiduciary duties of management and a duty to deal fairly with other creditors." *In re Beverages Int'l., Ltd., supra,* 50 B.R. at 282 (citing *In re American Lumber Co.,* 5 B.R. 470 (D.Minn.1980)). When the debt ceiling under the loan agreement was reached, Brier assumed an obligation to existing and future creditors, particularly the debenture holders, to take steps to stop the further accumulation of debt, and/or to at least disclose to potential investors the true condition of the business. Instead, Brier did nothing, while substantially more debenture debt was incurred, largely to his advantage. The conduct of David Brier is similar to that of the claimant in *In re N & D Properties, Inc., supra.* In that case, the Eleventh Circuit Court of Appeals found that despite the claimant's knowledge that the debtor, while insolvent, was still soliciting business with large advertised discounts, she "took no steps to stop advertising, to segregate deposits, to reduce the percentage of deposits accepted or simply to close the store." *Id.* at 732. The Court held that the claimant's behavior *while in control* "indicates that she was acting solely for her own benefit, to minimize her risk of loss without any consideration for other creditors." *Id.* (Emphasis added.)

Similarly, the conduct of David Brier put him in breach of his acquired fiduciary duty to the debenture holders of SFH. Not only did he fail to take any action to stop the solicitation and sale of more debentures, but upon learning of his unsecured status, he quickly demanded and received a mortgage on the real estate and a lien on the personal property as security for his antecedent debt. His continuing efforts to keep himself in a position superior to that of the unsuspecting debenture holders, constitutes a flagrant breach of his fiduciary duty to them. Although it was pronounced long ago, the following language still applies to the facts in the case at bench.

One who is in a fiduciary position "cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements."

*Pepper v. Litton,* 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939).

The actions taken by Brier to continuously protect and improve his position, while ignoring the deteriorating rights of past and future investors, were such a serious disregard of his fiduciary duty, that the conscience of any objective observer would be shocked. Such behavior amounts to the type of egregious conduct contemplated by the first stated element of equitable subordination for a non-insider. Therefore, even if Brier were not an insider, his actions were so egregious as to still require equitable subordination of his claim to the claims of the debenture holders.

Having determined that the Trustee has met his burden of proving inequitable conduct, the burden shifts to Brier to prove the fairness of his conduct in relation to the debenture holders.

Brier contends that he was not aware of the full extent of the debenture borrowings and implies, therefore, that he was not attempting to obtain an unfair advantage over those unsecured claims. The entire record, however, contradicts Brier's contention, which is simply not believable. As the debtor's accountant, Brier had full access to all of the SFH's financial records, including ledgers which showed interest paid to investors and income received from the sale of debentures. I find it absolutely impossible for Brier to have reconciled the

books, and prepared tax returns and financial statements for the business, without having full and complete knowledge of all of its financial transactions.

Next, Brier argues that it would make no sense for him to knowingly allow EMB to incur extensive debenture borrowings, since that indebtedness would only erode the value of his collateral, the EMB stock. While at first blush this argument seems plausible, on further analysis, it is evident that Brier was receiving a sufficiently high rate of return on his loan to offset any possible erosion. It was to Brier's advantage to collect his interest and commissions currently, in hard cash, while still having a stock pledge for the principal, rather than to lose that handsome 46.65% return if Bosler stopped selling debentures. This reasoning is consistent with the increase in debenture sales between 1978 and 1980, when EMB was under pressure to finance the 1980 balloon payment. In attempting to show his unawareness of the extent of the debenture borrowings, Brier relies on the fact that most of the debentures were sold after 1977, after most of his advances had been made. He fails to mention, however, that this was also the period of time immediately before the $450,000 principal payment was due.

Finally, Brier contends that he took no premature action, as an insider, to secure himself or to improve his position. We cannot forget, however, that throughout this entire period, until the due date of the 1980 balloon payment, Brier always believed he held the EMB stock as security, and therefore there was no reason for him to take "premature action." In addition, as soon as he discovered that he was in fact not secured, he took immediate action and demanded that the SFH give him not only a mortgage on the real estate, but also a security interest in all its personal property. Brier also suggests that because 43% of the debenture holders continued to renew their investments after 1980, this supports his contention that he was receiving no advantage. This would only hold water, however, if there was credible evidence that these investors were informed as to the true condition of the business. In fact, the evidence is quite to the contrary, and considering all of the foregoing, Brier has failed totally to prove that by his conduct he acted fairly toward the debenture holders.

With the hindsight that only judges enjoy, after hearing, it becomes obvious that while David Brier started out with only a client-accountant relationship, this developed into a very favorable (for Brier) debtor-creditor, then secured creditor relationship, and finally ended up with Brier's ownership of everything. This progression, which turned out to be so disastrous for "outside" creditors, would not have been possible but for Brier "and Co's" maneuvering and exercise of control of the business over a 12 year period.

The second prerequisite to the application of equitable subordination is that the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant.

"Harm may consist of ... the continued buildup of unsecured debt caused by the manipulation of the debtor by the claimant to his own advantage." *In re Beverages Int'l., Ltd., supra,* 50 B.R. at 283 (citing H. Chaitman, *The Equitable Subordination of Bank Claims,* 39 Bus.Law. 1561, 1570 (1985)). Here, the initial harm to the debenture holders was their continued, misinformed investment of unsecured money in an insolvent company. It is our conclusion that they were not merely uninformed, but that they must have received false information. More specifically, the actual damage is that the debenture holders are owed $1,401,000. Brier received an unfair advantage by using their money to pay himself interest and commissions, up front with every advance, and to pay down the liens on property at first secured, and then owned by him. Brier's becoming the owner of the property, but for proceedings such as this, effectively foreclosed the possibility of the debenture holders ever receiving anything for their investments.

Finally, the subordination of Brier's claim is not inconsistent with the Bankruptcy Code. Without violating his fiduciary

duty to the debenture holders, he could not have become a secured creditor in 1980, and certainly would not have become the owner of the property in 1982. Brier's apparent strategy, by keeping the business afloat, was to collect all he could in interest and commissions, until he became the outright owner of the property, and the success of that strategy was entirely dependent on the continued debenture sales. Enforcement of Brier's claim before the claims of the investors would do unthinkable violence to the doctrine of equitable subordination, and to equitable principles generally. *See In re Beverages Int'l., Ltd., supra,* at 284–85.

We do not rule, however, that claims of debenture holders *predating* the onset of the really inequitable and egregious conduct of Brier should be entitled to priority. The general rule is that "a claim or claims should be subordinated only to the extent necessary to offset the harm which the debtor and its creditors suffered on account of the inequitable conduct." *In re Mobil Steel Co., supra,* at 701. Based on all of the evidence, we find that Brier's inequitable conduct began, in earnest, in 1978, when he knew that the debt ceiling had been reached, and yet took no steps to stop or reduce the accumulation of new debt. Before that, even though Brier's conduct, at best, was questionable, it had not reached the extreme level of egregiousness necessary to require the application of the doctrine of equitable subordination. Therefore, only debentures sold or renewed

from that date forward are to be satisfied before Brier's claim.[9]

In aid of the above ruling, it is ordered that the deed and bill of sale executed in April 1982, conveying the personal property of Dade Service Co. and the real property of Bristol Associates to ADB, and the deed and bill of sale executed in October 1981, conveying the real and personal property of EMB and SFH to Dade Service Co. and Bristol Associates, are declared to be void, and that the subject property of those transfers is determined to be property of the estate. We also rule that the voiding of the deeds does not reinstate Brier's 1980 mortgage, which was previously found to be not the result of an arm's length transaction. "If equitable subordination is proper, the fact that the defendant was paid does not prevent this Court from subordinating his claim against the bankrupt (sic) [creditors] and, as a necessary corollary to that subordination, requiring him to return that which he has received." *Nicholson v. Core (In re Carolee's Combine, Inc.),* 3 B.R. 324, 327 (Bankr.N.D.Ga.1980).

In accordance with the foregoing, the claims of debenture holders for claims prior to 1978, totaling $591,000, are to share on a par with Brier's claim.[10]

## PREFERENCE AND FRAUDULENT CONVEYANCE [11]

The Trustee also argues that the conveyance of the real property to ADB in April 1982 was a preferential transfer, under § 547 of the Bankruptcy Code.[12] The

---

**9.** This amounts to $890,000, consisting of debenture loans to EMB, less principal repayments, for years 1978–1982, based on figures submitted by Brier (Defendant's Exhibit Nos. 37, 38).

**10.** If the subordination herein of ADB's claim and the avoidance of the conveyances in question withstand appellate scrutiny, the amount of Brier's claim, while disputed, is probably academic. Claims of the debenture holders, combined with past due taxes and the secured claim of the SBA, will very likely exceed the value of the estate, which consists primarily of the real and personal property. However, even if ADB's claim is held ultimately to be not subordinated to that of the debenture holders, we still decline to address this issue until the property has been liquidated and the value of the estate determined.

**11.** To date, it is undecided whether the applicability of the preference remedy pre-empts the use of equitable subordination. *See Wilson v. Huffman (In re Missionary Baptist Foundation of America),* 818 F.2d 1135, 1147 (5th Cir.1987). However, where, as here, the misconduct by the claimant involves much more than just a preferential transfer, subordination on totally independent ground is appropriate and necessary to offset the full extent of the harm.

**12.** § 547 Preferences
(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;

transfer by Dade Service Co. and Bristol Associates to ADB on April 29, 1982 was on account of an antecedent debt (the 1973 loan agreement), to an insider (Brier), within one year of the filing of the Bankruptcy petition (June 13, 1982). But even if Brier were not an insider, the transfer occurred within 90 days of the filing of the petition. Under § 547(b), the debtor is presumed to have been insolvent during the 90 days preceding the filing. Although I view the company as insolvent since its inception, when only 6¼% initial capital was paid in, even a very conservative view would find that in 1978, when the debt limit set by EMB and Brier was exceeded, the business was clearly insolvent, and stayed that way through June 1982.

The final requirement under § 547(b) is that the transfer:

> "enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. §§ 547(b)(5).

To establish that ADB (Brier) received more by the April 1982 transfer than it would have under a chapter 7 liquidation in June 1982 (the date of the bankruptcy petition filing), the Trustee must provide competent evidence on two points. First, the Court must be able to determine the market value of the property, real and personal, in April 1982, the date of the conveyance, and in June 1982, the date of the filing of the bankruptcy petition. Secondly, we must be able to determine the amount of Brier's claim as of the filing date.

Unfortunately, there is a paucity of competent evidence regarding the market value of the subject property as of April 1982, and no evidence of value for June 1982. The 1970 appraisal of William E. Coyle, Jr., furnished by the defendant (*see* Defendant's Exhibit No. 12D) and purportedly updated as of April 1982, is of little assistance, mainly because it is based exclusively on replacement cost less depreciation, and fails to consider the other two approaches to value typically used in the appraisal process. The property involved here, the Max Sugarman Funeral Home, was originally residential property, and its conversion to a funeral home operation in the 1930's did not thereafter render it useless for anything other than that special purpose. In fact, in 1982 (and at the present time) its highest and best use may well be as a conversion to residential apartments or condominiums, or even to office condominium use. Since the subject property was not constructed originally as a special purpose building, Mr. Coyle's exclusive reliance on the cost approach to value is inappropriate, in our view. Even without testimony directly on the subject, it is certainly within the province of this Court to recognize that there have been many sales of buildings, similar to and in the immediate area of the subject property, and close enough in time, to serve as comparable sales. A more objective appraisal would also have considered the two most common approaches to value: income, and market data. In addition, in updating his appraisal from 1970 to 1982, Mr. Coyle was much too conservative in his allowance for inflation, and he even failed to include the years 1981 and 1982, which, of course, reduced his opinion of value to an even lower figure. The appraisal also provided, without explanation, for excessive depreciation, in order to arrive at an unreasonably low market value ($370,000), and his 40% depreciation factor is rejected, as is his opinion of value. If there is any basis for Mr. Coyle's conclu-

---

(4) made—
(A) on or within 90 days before the date of the filing of the petition, or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would have received if—
(A) the case were a case under Chapter 7 of this title.

**21**

sions, he has failed to explain them. On the other hand, the testimony of Mitchell Sugarman is of equally little assistance because of: (1) his obvious bias and interest, throughout the pendency of this case, as the owner and operator of the only competing Jewish funeral home in the area, and (2) his opinion of value included elements of going concern value, good will, and name recognition, which are no part of the market value of the real estate.

Likewise, on the present record, we are unable to ascertain the amount of ADB's claim. No proof of claim was filed by ADB, which would have constituted prima facie validity thereof, Bankruptcy Rule 3001(f). The only amount relied upon by ADB, in its counsel's trial brief, was the amount recited in the October 1980 forebearance agreement, $500,000.[13] Because we have previously determined that this 1980 mortgage was obtained improperly, we do not accept the stated figure of $500,000 as an acknowledgment by EMB and the SFH of ADB's claim in that amount. Therefore, as with the market value of the property transferred, we are unable to determine the amount of ADB's claim with any degree of certainty. Based on these insufficiencies, and because we believe our equitable subordination decision to be supported by the record, we decline to decide the preference or the fraudulent conveyance issues at this time.[14] Regarding the validity of the claims for preference or fraudulent conveyance, we reserve judgment, until such future time when the matter may again be before us. In the interest of judicial economy, this approach seems best considering the amount of time this litigation has been pending, and our belief that the decision herein is amply supported. If required to re-open the matter, only the narrow issues of the market value of the

property and the amount of Brier's claim would need be addressed.[15]

Finally, the Trustee's request for a turnover of the books and records of the SFH and a demand for an accounting of the business by Dade Service Company is denied, in light of the settlement entered into on December 30, 1987, dismissing "all other claims" against Dade Service Company, Inc.

Enter Judgment accordingly.

---

**13.** While the forebearance agreement recites $500,000 as the indebtedness due from EMB to ADB, ADB's counsel states the value as $534,388, presumably, although it is unclear, the difference represents accruing interest. (Defendant's Memorandum of Law, May 31, 1988, p. 9.)

**14.** As with the preference claim, the claim under the fraudulent conveyance provision, § 548, would require proof of the market value of the

property conveyed, since the Trustee is arguing that ADB received more than a reasonably equivalent value in exchange for the transfer.

**15.** Under the equitable subordination provision of the Code, § 510, we are not required to determine the market value of the property conveyed in order to avoid the transfer. The basis for invalidating the conveyance is the inequitable conduct of the transferee, David Brier.