In re EMB ASSOCIATES, INC., Max Sugarman Funeral Home, Inc., Debtors.

Jason MONZACK, Trustee, Plaintiff,

v.

ADB INVESTORS, Bristol Associates, Inc. and Dade Service Company, Defendants.

Bankruptcy Nos. 8200568, 8200569. Adv. No. 820405.

United States Bankruptcy Court, D. Rhode Island.

May 26, 1989.

---

Z. Hershel Smith, Di Sandro–Smith Associates, Providence, R.I., for the Trustee.

Robert D. Wieck, Adler, Pollock & Sheehan, Providence, R.I., for ADB Investors.

David J. McOsker, McOsker, Isserlis & Davignon, Providence, R.I., for Bristol Associates, Inc. and Dade Service Co.

## DECISION AND ORDER ON REMAND

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

We rendered our decision in the captioned adversary proceeding on October 21, 1988, 92 B.R. 9, and granted the plaintiff partial relief. Feeling aggrieved, the defendant, ADB Investors, appealed our ruling to the United States District Court for the District of Rhode Island. After hearing, Chief Judge Francis Boyle, to avoid the possibility of piecemeal litigation, remanded the matter back to this Court "to determine the issues of voidable preference and fraudulent conveyance under §§ 547 and 548 of the Bankruptcy Code," which determinations we had opted to forego in our decision. (*See* p. 21.) After a chambers conference in the Bankruptcy Court on April 11, 1989, the Trustee was given until April 18, 1989 to file a Motion to Reopen, for the purpose of offering (additional) evidence on the preference and fraudulent conveyance issues. The Trustee, however, elected not to file any other pleadings, and consequently the matter is before us again on the same record we had at the conclusion of the trial on the adversary proceeding.

With the above procedural background in mind, we begin our present assignment by making reference to the findings contained in our October decision which are relevant to the two remanded issues.[1]

### FINDINGS OF FACT

1. On October 10, 1980, only *after* David Brier, the principal and alter ego of defendant-appellant, discovered that the stock pledge supposedly securing his 1973 loan agreement was unperfected, did he insist on and obtain from the debtor a mortgage on the real estate,[2] and a securi-

---

1. The complete findings of fact and detailed factual background contained in our October 21, 1988 decision are incorporated herein by reference. Given our thirty page discussion and analysis of this adversary proceeding in the October decision, it would not be productive to repeat the entire record here. The instant deci-

sion reaffirms our October 21, 1988 findings of fact and consequently, obviates the need to rule on Defendant's Motion for Dissolution of Supersedeas Bond.

2. Although we have not previously verbalized it, this is additional evidence of the domination being exercised by Brier over the Sugarman

ty interest in the tangible personal property of the funeral home. We ruled that said mortgage acquisition "was not the result of arm's length negotiations between EMB and ADB." (*See* p. 13, and discussion therein), the mortgage and security agreement were declared void, and ADB was relegated to the unsecured position it originally held when it entered into the 1973 loan agreement with EMB and the SFH.

2. The October 1981 transfers of the personal property and real estate by the debtor to Dade Service Company and Bristol Associates, respectively, were a sham, and changes in name only (*see* p. 13). These conveyances, which were also voided, remain invalidated for the same reasons discussed in our October decision (*see also* p. 19). Thus, the subject real estate and personal property, when transferred to ADB in April, 1982, were the property of the debtor,[3] and not of Dade Service Co. or Bristol Associates.

3. The actual market value of the property as of April, 1982, or in June, 1982, (the date of the filing of the bankruptcy petition) has not, to this day, been established by either party, to the satisfaction of this Court. Notwithstanding the absence of such evidence, we are required by the order of the District Court to find that the property did have a value as of the dates in question, and at a minimum, we find the fair market value to be *at least* the $370,000 stated by William Coyle in his 1970 appraisal (updated, 1982). This appraisal, which was discussed in detail in our previous decision was unreasonably conservative, but the evidence is sufficient to establish a minimum value, which is sufficient

for present purposes, and that is what we have done.

4. The precise amount of ADB's claim against the estate was, likewise, not established by competent evidence. Because ADB technically "owned" the subject property at the time of the filing of the involuntary bankruptcy petition, it did not file a proof of claim. Nevertheless, based on the entire record, we are able to find that ADB did advance $467,500 to the debtor between 1973 and 1980, and that the debtor did not repay this sum in July, 1980, as required. Under the 1980 forebearance agreement, the debtor made an initial $10,000 payment, and thereafter, during 1980 and 1981,[4] the debtor paid $2,000 per month to ADB under the repayment structure of the "mortgage" given on October 10, 1980.[5] $12,000 was paid to ADB during that year. In the payment year 1981–1982, the debtor paid $7,000 per month from August, 1981, until March, 1982, for a total of $56,000. Therefore, the debtor paid $78,000 during the years 1980 through 1982. Deducting the $78,000 from the principal loan amount of $467,500, leaves a claim by ADB of $389,500.

5. As to the preference claim, we have previously found that: (1) the transfer by Dade Service Co. and Bristol Associates to ADB on April 29, 1982, was for the benefit of a creditor (ADB Investors); (2) the transfer was on account of an antecedent debt (the $467,500 advanced under the 1973 loan agreement); (3) the transfer was made while the debtor was insolvent (the SFH was insolvent, at least as of 1978, when the debt limit set by EMB and Brier was exceeded); and (4) the transfer was made to an insider (Brier) within one year of the

---

Funeral Home from very early on in the relationship, and further bolsters our conclusion that Bosler and Brier were acting in concert for their respective interests.

3. Throughout this decision we characterize the debtor as a single entity. However, in reality the debtor consists of two corporations, EMB Associates and the Sugarman Funeral Home. For simplification and convenience (the bankruptcy cases were consolidated), we will refer only to "the debtor." For the same reason, we refer to "Brier" and "ADB" interchangeably.

4. The refinancing schedule apparently ran on a twelve month basis, from August to July. The first $2,000 payment was due on August 1, 1980, and continued through the end of July, 1981. In August, 1981, the payment increased to $7,000 per month. The debtor made this payment approximately until April, 1982, when it (predictably) defaulted, at which time ADB acquired title to the property.

5. *See* Plaintiff's Exhibit 8G (Promissory Note dated October 10, 1980).

filing of the Bankruptcy petition (June 13, 1982), and even if Brier were not deemed an insider, the transfer occurred within 90 days of the filing of the petition.

## DISCUSSION

Upon reconsideration of the evidence and the law, we find as a fact and conclude as a matter of law that a preference was realized by ADB when it received the real estate and personal property of the debtor on April 29, 1982. In addition, because of the activities of Brier, Bosler and Lehrer, as more particularly described in our October ruling at pages 13–14, we also find that a fraudulent conveyance claim under § 548(a)(1) has been established.

## THE PREFERENCE

11 U.S.C. § 547(b) sets forth the requirements for establishing a preference:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;

■ Since we have concluded above that the Trustee has satisfied four of these five elements, the only remaining issue (which was specifically left undecided in our October decision) is a determination of whether ADB received more by the April, 1982, transfer than it would have received upon liquidation on June 13, 1982, the day of the filing of the involuntary petition. In our October decision, we stated that we preferred not to decide that issue because of weak evidence as to the market value of the property on the dates in question, and because of the poor record regarding the exact amount of ADB's claim. We proceeded in that fashion because of our opinion that the equitable subordination ruling was dispositive. However, we have now been called to task by the District Court, and in view of the Trustee's (mysterious) election not to attempt to re-open and introduce evidence of value, are required to decide these issues on the record as it stands.

Although it is certainly preferable to have accurate figures in hand for comparison between what was received by a transfer, and the amount that would have been recovered in a Chapter 7 liquidation, such is not always the case. Understandably then, "it is not necessary to quantify the amount of preferential effect under § 547(b)(5) with actuarial certainty. It is sufficient under § 547(b)(5) for the court to determine that the effect of the transfer was to pay more to the [creditor] than it would have received in a Chapter 7 case." *In the Matter of Craig*, 20 C.B.C.2d 85, 92, 92 B.R. 394 (Bankr.D.Neb.1988).

In the matter before us, we know that on June 13, 1982, the market value of the subject property was at least $370,000 (not including the personal property). We know that the estate had unsecured debenture debts of $1,401,000. We have determined that ADB had an unsecured claim of, at least, $389,500, and that at the time of the filing of the petition, the SBA was a secured creditor in the amount of $215,-984.11. In addition, the debtor listed in its schedules a $20,717.06 tax obligation to the City of Providence. Given the amount of undisputed debt; secured of at least $236,-601.17, and unsecured of approximately $1,800,000, there is no question that ADB, in a Chapter 7 liquidation would have received less than the amount it received by virtue of the April, 1982, transfer. "Unless the assets in a bankruptcy estate are sufficient to provide in liquidation a one hun-

dred percent distribution to creditors, any unsecured creditor holding an unsecured claim who receives a payment during the preference period is in a position to receive more than it would have in a Chapter 7 liquidation." *In the Matter of Lawrence,* 17 B.C.D. 108, 110, 82 B.R. 157 (Bankr.M. D.Ga.1988) (other citations omitted). It follows inescapably, therefore, that the conveyance in question should be set aside, and that the property be declared to be the property of the debtor as of April, 1982, as well as on June 13, 1982, the date of the petition.

## THE FRAUDULENT TRANSFER

██ We also find the April 1982 transfer to be a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(1), which provides:

FRAUDULENT TRANSFERS AND OBLIGATIONS.

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

██ The insider actions taken by Brier while he was the accountant for the debtor-to-be, and in obtaining title to the debtor's property, with no notice to creditors, are precisely the type of conduct contemplated by § 548(a)(1) for avoiding a conveyance as fraudulent. Where a transaction is entered into intentionally to satisfy an unsecured debt, and with "full knowledge harm would come to creditors of the [debtor], hindering or delaying the ability of these creditors to receive satisfaction of debts owed to them by the [debtor]," a fraudulent conveyance under § 548(a)(1) has been shown. *Coleman American Moving Services, Inc. v. First Nat'l. Bank & Trust (In re American Properties, Inc.),* 8 B.C.D. 776, 780, 14

B.R. 637 (Bankr.D.Kan.1981). The element of intent envisioned by this section may be inferred from what has been characterized by some courts as "badges of fraud." *In the Matter of Craig, supra,* 20 C.B.C.2d at 94, 92 B.R. 394. Included among these badges are such actions as "a transaction in anticipation of litigation," particularly when the debtor's assets are greatly reduced, *In the Matter of Craig, supra* (citing *Arnold v. Dirrim,* 398 N.E.2d 442 (Ind. App.1979)); "a transaction outside one's usual course or mode of doing business," *Craig, supra* (citing *Bank of Sun Prairie v. Hovig,* 218 F.Supp. 769 (W.D.Ark.1963)); "the mortgage transaction occurred while the debtor was insolvent" *Craig, supra* (citing *Sun Prairie, supra,* at 776); and "the mortgage transaction resulted in a transfer of all debtor's property of substantial value" *Craig, supra* (citing *Duncan v. First Nat'l. Bank of Cartersville,* 597 F.2d 51 (5th Cir.1979)). "Where there is a concurrence of several such badges, an inference of fraudulent intent may be warranted" *Matter of Craig, supra,* 20 C.B. C.2d at 94, 92 B.R. 394. In addition, it is settled that a finding of fraudulent intent may be made on the basis of circumstantial evidence. *Consove v. Cohen (In re Roco Corp.),* 701 F.2d 978; 10 B.C.D. 275, 279 (1st Cir.1983). The case at bar fits perfectly within each of the foregoing criteria, all supported by impressive authority.

There is no doubt that the April, 1982, transfer, just two months before the involuntary bankruptcy petition was filed, conveyed away all of the debtor's property of substantial value. The transfer occurred while the debtor was insolvent, and it was clearly a transfer outside of the ordinary course of business of the debtor. We also conclude that the transfer was made in anticipation of litigation since Brier, as well as the other SFH players, Bosler and Lehrer, were well aware of the failing financial condition of the business, and the inevitable pressure soon to be exerted by the unsuspecting debenture holders, who were anticipating scheduled returns on their investments. In this regard, we specifically held in our October ruling that Brier, Bosler and Lehrer were acting solely in behalf of their

respective personal interests, and that "transferors and transferees were making deals as though there were no debenture holders, but the reality is that they were acting with the knowledge that there were very substantial numbers of debenture holders [$1,401,000 worth] out there" (p. 14).

In addition to our earlier discussion on the preference issue, it must be kept in mind when considering the issue of intent on the fraudulent conveyance claim, that Brier had already obtained the mortgage invalidly in 1980, after learning that he was unsecured, and that this was done with full knowledge of the extensive debenture debt of the debtor. It was at that point that Brier, Bosler and Lehrer engaged in the ensuing fraudulent conduct which left Brier with ownership of the property, at the expense of the debenture holders. "Fraudulent intent does not require an intent to run the company aground; it requires merely an intent to hinder or defraud creditors." *In re Roco, supra*, 701 F.2d 978, 10 B.C.D. at 279. Taking all of these factors into consideration, we find as a fact and conclude as a matter of law that the debtor, via the sham transaction by Dade Service Co. and Bristol Associates, transferred ownership of its real and personal property to ADB Investors with the clear intent to hinder, defraud or delay creditors.

Accordingly, it is our conclusion that the Trustee has also established a fraudulent conveyance claim against the defendant, ADB Investors.[6]

Enter Judgment accordingly.

---

**6.** While the trustee argues in his Memorandum in Opposition to Defendant's Motion to Vacate Supersedeas Bond that it will not be necessary to reach the equitable subordination claim on appeal if he prevails on the preference and fraudulent claim claims, for the purpose of distribution, we do not agree. Our findings of preference and/or fraudulent conveyance merely bring the property back into the estate, and without more, ADB still has its unsecured claim, in the same class as other unsecured creditors. However, under our equitable subordination ruling, ADB's entire claim will not share on the same basis as the other unsecured creditors, but rather will begin to participate in any distribution only after the claims of the debenture holders arising during or after 1978 are satisfied. (*See* p. 19.)