**MAX SUGARMAN FUNERAL HOME, INC., E.M.B. Associates, Inc. and Jason Monzack, Trustee,**

v.

**A.D.B. INVESTORS.**

Civ. A. No. 89–0058 B.

United States District Court, D. Rhode Island.

Oct. 4, 1989.

Z. Hershel Smith, Providence, R.I., for Jason Monzack, Trustee.

Robert D. Wieck, Providence, R.I., for A.D.B. Investors.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This is an appeal by A.D.B. Investors from a decision of the bankruptcy court. 100 B.R. 629. The bankruptcy court determined that a mortgage dated October 10, 1980 and 1982 transfers of real estate and personal property to A.D.B. Investors should be set aside and A.D.B.'s underlying claim equitably subordinated to the unsecured claims of debenture holders of Max Sugarman Funeral Home, Inc. The bankruptcy judge determined that the 1982 transfers of real estate and personal property to A.D.B. Investors were both a fraudulent conveyance and a preferential transfer and declared them void pursuant to §§ 547(b) and 548 of the Bankruptcy Code.

In March of 1970 the Sugarman family sold the real estate where the Max Sugarman Funeral Home operated at 458 Hope Street, Providence, Rhode Island together with all the capital stock of Max Sugarman Funeral Home, Inc., an operating company for the funeral home business, to E.M.B. Associates, Inc. The principals of E.M.B. Associates were initially Irwin M. Bosler, Roy Lehrer and Robert E. Goldblatt. The purchase price of the real estate and the stock was approximately $1,200,000. The principals contributed $75,000, borrowed an additional $350,000 from acquaintances and friends and made a deposit of $425,000. The balance of the purchase price, approximately $775,000, was financed by a first mortgage of the real estate retained by the Sugarman family. Some seven months later in October of 1970 E.M.B. Associates, Inc. borrowed $300,000 from Rhode Island Hospital Trust National Bank on a guaranteed S.B.A. loan to repay the money borrowed from acquaintances and friends in connection with the purchases.

It was soon clear that the income from the funeral home was not sufficient to keep the business going and pay the outstanding loans. To raise the necessary steady supply of large amounts of money two actions were taken. First, Bosler began a program of selling 5 year debentures in the funeral home, paying 13% interest per annum. A total of $1,854,000 was raised from 1970 to 1982. Sixty percent of the debentures were sold between 1978 and 1982 at a time when the financial condition of the business worsened dramatically.

The second action taken was to obtain loans from a limited partnership called A.D.B. Investors. When Bosler became one of the purchasers of the funeral home in 1970, Alan D. Brier, an accountant and long time acquaintance of Bosler, became the accountant for the funeral home, a position which he continued to hold until involuntary petitions in bankruptcy were filed.

In 1973 the accountant, Mr. Brier, formed a limited partnership called A.D.B. Investors, of which he was a General Partner, to provide financing to the funeral home in a total amount of $450,000. At the time the operating profits of the funeral home were approximately $100,000 per year. Ultimately, A.D.B. Investors planned to loan a total of $498,000 to E.M.B. Associates, Inc. Between January of 1973 and March, 1980, A.D.B. Investors

actually advanced $467,500 to E.M.B. Associates, Inc. The principal balance of the loan was due in one payment on July 1, 1980.

During the seven years when A.D.B. Investors was advancing money to E.M.B. Associates, Inc., Brier was the company accountant with full access to all of the funeral home's books, prepared tax returns, and internal financial statements and knew all about the business, including the debenture sales.

In 1977 the debenture sales increased dramatically and there were discussions between Brier and Bosler concerning the almost 1/2 million dollar payment due A.D.B. on July 1, 1980. In spite of his knowledge of the increasing debt, and his knowledge of the poor financial condition of the corporation, Brier continued to advance funds to E.M.B. Associates, Inc. Brier also included false interest figures in the 1978 tax returns that he prepared for the funeral home. Due to the actions of Bosler and Brier the funeral home was able to continue to operate from 1978 to 1982, essentially on the basis of increased debenture sales made possible through the misrepresentations to investors, including false internal financial statements and doctored tax returns.

In 1980 when the entire A.D.B. Investors loan became due and when Brier had first learned that a security interest had not been perfected in the stock of the funeral home, Brier insisted on obtaining a mortgage on the real estate and a security interest on the tangible personal property. This was accomplished on October 10, 1980.

At this time the net operating profit of the business remained at about $100,000 a year before debt service. The S.B.A. mortgage payment was $4,300 a month. The A.D.B. note secured by the mortgage provided for payments of $2,000 per month for the first year and then payments for the following years rose as follows:

$7,000 per month in 1981;
$8,000 per month in 1982;
$9,000 per month in 1983; and
$10,000 per month in 1984.

During 1980 and 1981 the debenture sales continued and the proceeds were used to pay the S.B.A. debt, the Sugarman family mortgage and A.D.B. Investors' mortgage interest, the debenture holders and the operating expenses of the business.

In October 1981 the Sugarman Funeral Home personal property was transferred to a corporation known as Dade Service Company and the real estate was conveyed to Bristol Associates, Inc.; the sole stockholder of both corporations was Roy Lehrer, one of the original principals of the 1970 acquisition of the funeral home. Under the agreement, consideration for the transfer furnished by Dade was its assumption of the funeral home's trade accounts payable, security agreements of record and past obligations due Mr. Lehrer, together with an assumption of the funeral home's accounts receivable and inventory. This transaction occurred two months after the monthly mortgage payment to A.D.B. Investors' increased from $2,000 to $7,000. The transfer of the real estate to Bristol Associates was accomplished by a deed which did not recite consideration. When in April of 1982 the funeral home defaulted on one of the $7,000 monthly payments due to A.D.B. Investors, the parties agreed to a transaction whereby a deed in lieu of foreclosure was given A.D.B. Investors by Bristol Associates and a bill of sale in lieu of foreclosure was given by Dade Service Company to A.D.B. Investors. A.D.B. Investors then leased the property back to Dade Service Company for five years. The stock of Dade was pledged as security for the lease and the lease was guaranteed by Bosler, his wife and his son.

Approximately two months later, on June 13, 1982, Max Sugarman Funeral Home, Inc. and E.M.B. Associates, Inc. were petitioned into involuntary bankruptcy by three debenture holders. At the time of the petition the bankrupts owed the debenture holders over $1,400,000. The bankruptcy court concluded that the agreement in lieu of foreclosure was a voidable preference under the provisions of 11 U.S.C. § 547 and that the conveyance on the same date of the real estate was a fraudulent conveyance under the provisions of 11

U.S.C. § 548(a)(1). It also directed that all of A.D.B.'s claims be equitably subordinated to the claims of debenture holders arising during or after 1978, under the provisions of 11 U.S.C. § 510(c). The appellant A.D.B. Investors contends that the bankruptcy court erred in determining that the April 29, 1982 transfers were voidable preferences and fraudulent conveyances and that A.D.B.'s claims should not be equitably subordinated.

The appellant argues that the principle of equitable subordination was applied by the bankruptcy court to A.D.B.'s claim as a substitute for a voidable preference or fraudulent conveyance claim; that Mr. Brier was not an insider or a fiduciary; that he did not breach a fiduciary duty; that his conduct was not so egregious that equitable subordination was warranted and that Mr. Brier's conduct did not give him an unfair advantage or harm debenture holders.

The bankruptcy court, on its first hearing of the case, found that A.D.B.'s mortgage should be voided on the basis of the equitable subordination doctrine of § 510 of the Bankruptcy Code. 92 B.R. 9. October 21, 1988 Decision, at 19–20. Because of the dominating role that Brier played in the financial aspects of the business, the bankruptcy court determined that the mortgage and the subsequent foreclosure agreement were not the results of arm's length negotiations and should be equitably subordinated. *Id.* The bankruptcy court did not determine whether the April, 1982 transfer was either a voidable preference under § 547 or a fraudulent transfer under § 548 of the Bankruptcy Code, specifically citing the lack of evidence to support either claim. *Id.* at 20, 21. Instead the court relied upon its equitable subordination ruling as dispositive.

Upon appeal of that decision, A.D.B. argued that the bankruptcy court erred in applying the principle of equitable subordination as an avoidance remedy. This court then vacated the October 21, 1988 Decision of the bankruptcy court and remanded the case for a determination of the voidable preference and fraudulent transfer issues before determining the legal question of equitable subordination as an avoidance remedy. Because the Trustee did not reopen the record upon remand, no additional evidence was offered on the voidable preference and fraudulent transfer issues. As a result, the bankruptcy court was faced with deciding these issues on the same record as in the first case. On May 26, 1989, the bankruptcy court issued its Decision and Order on Remand. The court again found that the doctrine of equitable subordination applied to the 1980 mortgage, thereby invalidating the foreclosure and relegating Brier to the position of an unsecured creditor. May 26, 1989 Decision, 100 B.R. 629 at 630–31. Based on this, the court, on the same record as in the first case, found that the 1982 transfer in lieu of foreclosure was a voidable preference under § 547 and was a fraudulent transfer under § 548. *Id.* at 632–33, 634.

■ Under Section 547(b), a transfer may be avoided when: (1) it is made to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) while the debtor is insolvent; (4) between 90 days and one year before the filing of a petition for bankruptcy, or within one year of filing if the creditor is an insider; and (5) will enable the creditor to receive more than he would have if the transfer had not been made and the debtor's property were divided under a chapter 7 liquidation.[1]

---

1. Section 547(b) of the Bankruptcy Code states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3) made while the debtor was insolvent;
  (4) made—

    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
  (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and

The bankruptcy court determined that the first four tests were met and then attempted to make a calculation as to what Brier would have received under Chapter 7 liquidation.

Because of the nature of the calculation, the value of the property both at the time of the transfer and at the time of the filing of the bankruptcy petition is necessary. The only valuation information available was a 1970 valuation (presumably updated to 1982) of $370,000. Based on this, and coupled with its previous determination that Brier was an unsecured creditor due to the invalidation of the 1980 mortgage, the bankruptcy court made a calculation by subtracting the secured debt from the minimum property value. The value of the A.D.B. debt was determined by subtracting a total of $78,000 of payments on account of $467,500 loaned to E.M.B., for a total debt remaining of $389,500. The calculation is as follows:

| | |
|---|---|
| $370,000.00 | Minimum property value |
| —215,984.11 | SBA loan |
| — 20,717.06 | City of Providence taxes |
| $133,298.83 | Minimum amount remaining |

The court then determined that the combined unsecured debt, $1,401,000 due to debenture holders and $389,500 due to Brier, contrasted with the available monies, would necessarily result in a lesser amount going to A.D.B. under a Chapter 7 liquidation than under the April, 1982 transfer. May 26, 1989 Decision at 632–33.

A.D.B., on the other hand, did not concede that the 1980 mortgage is void. It claims that the amount which A.D.B. would receive under Chapter 7 in June, 1982, is the same as it received as a result of the April, 1982 transfer, that is, the property value less senior secured debt. A.D.B. provided some updated figures for the personalty which was transferred, but used the 1970 valuation for the realty. Its calculation is as follows:

| | |
|---|---|
| $457,796.07 | Total minimum property value (Realty: $370,000 Inventory: $20,997 Equipment: $25,000 Accounts Receivable: $41,799.07) |
| — 253,484.72 | Senior secured debt (SBA: $215,984.11 Providence: $20,717.06 Unknown: $16,783.55) |
| $204,311.35 | Property value less senior secured debt. |

■ It is obvious that the value of the property, both at the April, 1982 transfer and at the June, 1982 bankruptcy filing, is crucial in determining the fifth prong of the voidable preference test. The Trustee introduced no evidence of the value other than the $370,000 figure based on 1970 data. A.D.B. added current figures for the personalty, but based its calculation on the 1970 figure for the realty as well. Given a general substantial increase in real estate values in the Providence, Rhode Island area during the period, the figure is less than helpful. While it is true, as the bankruptcy court pointed out, that "actuarial certainty" is not required in determining any preferential amount, any calculation based on this figure borders on speculation. Moreover, the A.D.B. debt must be classified either as secured or unsecured before any realistic calculation can be made. That once again raises the question as to the validity of the 1980 mortgage. A finding that the April, 1982 transfer was a voidable preference under § 547(b) is not supported by the acceptable evidence. It is therefore necessary to consider if the transaction was a fraudulent transfer.

A transfer of interest may be deemed voidable under § 548 if the debtor made the transfer: (1) with the intent to hinder, delay or defraud any creditor; or (2) received less than a reasonably equivalent value, in exchange and the debtor was insolvent, undercapitalized or was about to incur debts beyond his ability to pay.[2]

---

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1982 & Supp. V. 1987)

**2.** Section 548(a) of the Bankruptcy Code reads in full:

§ 548 *Fraudulent transfers and obligations*

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

A claim under § 548(a)(2) would require proof of the market value of the property transferred, to show that A.D.B. received more than a reasonably equivalent exchange. As discussed *supra*, a realistic calculation of the market value of the property at the time of the transfer is not available, given the evidence.

■ However, the bankruptcy court considered the intent of the debtor which he based on the impending insolvency of the business, the likelihood of litigation ensuing from the impending insolvency, and the fact that substantially all of the debtor's property of value was transferred. May 26, 1989 Decision, at 633–34. The bankruptcy court found that the transfer was a fraudulent conveyance under § 548(a)(1). The bankruptcy court was correct.

The bankruptcy judge was in the best position to gauge the relationship between the parties. His findings that the April, 1982 transfers of the deed in lieu of foreclosure and bill of sale in lieu of foreclosure were fraudulent transfers will not be disturbed here. Invalidating the April, 1982 foreclosures removes A.D.B. from the category of owners, who have no claim against the estate, and relegates it to the class of secured creditors, who must share with the other secured creditors of the estate. Once again the status of the 1980 mortgage comes into question as a key to the controversy.

■ Under § 510 of the Bankruptcy Code, a bankruptcy court may subordinate, under the principles of equitable subordination, all or part of a claim to all or part of another claim, or order that any lien securing the subordinated claim be transferred to the estate. 11 U.S.C. § 510(c). The principles of equitable subordination are judicial rather than statutory determinations. Generally:

(1) the claimant must have engaged in some type of inequitable conduct;

(2) which resulted in injury to the bankrupt's creditors or which conferred an unfair advantage to the claimant; and

(3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code.

*Benjamin v. Diamond (In re: Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977).

Brier obtained the 1980 mortgage to secure his 1973 loan upon discovering that this loan was unsecured by the stock which was supposed to be in escrow. He had access to all the financial records of the business and was or should have been aware of the increase in debenture sales, above the ceiling amount, to finance the balloon payment coming due. The bankruptcy court could justifiably turn a particularly jaundiced eye toward the evolution of Brier's relationship from accountant-client to creditor-debtor, to secured creditor and finally eventual owner. October 21, 1988 Decision, at 18.

The principles of equitable subordination allow a court to "ascertain the validity of liens, marshal them, and control their enforcement and liquidation." *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). The bankruptcy court determined that the circumstances surrounding the making of the 1980 mortgage did not bear the indicia of an arm's length bargain and should be invalidated. May 26, 1989 Decision, at 630–31. Again, the bankruptcy court was better able to evalu-

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a) (1982 & Supp. V).

ate the credibility of the witnesses and the evidence and to determine that the mortgage should be set aside as inequitable and injurious to the other creditors. Since these findings of fact are not clearly erroneous, they will not be set aside.

Bankruptcy courts, traditionally regarded as courts of equity, "possess the power 'to prevent the consummation of a course of conduct by [a] claimant which ... would be fraudulent or otherwise inequitable' by subordinating his claims to the ethically superior claims asserted by other creditors." *Benjamin*, 563 F.2d at 699 (*quoting Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946)). "[T]he fact that such a claim may be secured is of no consequence to the issue of subordination." *In re Castillo*, 7 B.R. 135, 138 (S.D. N.Y.1980) (citing legislative history). The Court in this case determined that the holders of debentures issued between 1978 and 1982 and amounting to $890,000 possessed ethically superior claims to A.D.B.'s fraudulently obtained secured claim under the mortgage. It was justified in doing so.

Once a claim that is secured by lien is subordinated under the principles of equitable subordination, the lien may then be transferred to the debtor's estate. 11 U.S.C. §§ 510(c)(2), 541(a)(4). The claim then becomes unsecured and the property securing the lien becomes part of the debtor's estate. 11 U.S.C. § 541(a)(4). In this case, then, the effect of the bankruptcy court's subordination of A.D.B.'s claim is to (1) remove A.D.B. from the class of secured creditor, and (2) subordinate its unsecured claims to the claims of the other unsecured creditors, who include the holders of debentures issued between 1978 and 1982.

Based on the foregoing, the bankruptcy decision is reversed as to the voidable preference issue and affirmed as to the fraudulent transfer and equitable subordination issues, and the judgment of the Bankruptcy Court is therefore affirmed.

SO ORDERED.