**In re MAX SUGARMAN FUNERAL HOME, INC., E.M.B. Associates, Inc., Debtors.**

**Jason MONZACK, Trustee, Plaintiff,**

v.

**A.D.B. INVESTORS, Bristol Associates, Inc. and Dade Service Company, Defendants.**

Bankruptcy Nos. 82–00568, 82–00569. Adv. No. 82–0405.

United States Bankruptcy Court, D. Rhode Island.

Dec. 30, 1992.

Z. Hershel Smith, DiSandro–Smith Associates, Inc., Providence, RI, for Trustee.

Robert D. Wieck, MacAdams & Wieck, Inc., Providence, RI, for A.D.B. Investors.

Jason Monzack, Chapter 7 Trustee, Kirshenbaum & Kirshenbaum, Cranston, RI.

## DECISION AND ORDER ON FIRST CIRCUIT COURT OF APPEALS' REMAND

ARTHUR N. VOTOLATO, Bankruptcy Judge.

### I. TRAVEL AND BACKGROUND

The travel of this aging adversary proceeding is lengthy and circuitous. On October 21, 1988, we issued our initial decision subordinating the "claim"[1] of ADB

---

1. In our October 1988 decision we loosely termed ADB's interest in the Estate as a "claim". In fact, ADB had not then filed an actual claim in the bankruptcy case since it was the holder of a deed in lieu of foreclosure covering the funeral home assets. However, based upon ADB's conduct, through its principal Alan Brier, we ordered that its ownership interest in the real estate and personal property be avoided under principles of equitable subordination (a ruling later determined to be erroneous), and ruled that it was left with a "claim" which was subordinate to the interests of the post–1977 debenture holders. After a remand and further ap-

Investors ("ADB") to the claims of debenture holders who invested or renewed after 1977. On appeal, that decision was remanded by the District Court for a determination of issues of preferential transfer and fraudulent conveyance raised by the Trustee but not previously decided. Accordingly, on May 26, 1989 we issued our second opinion, 100 B.R. 629, ruling that the 1982 transfers constituted both a preferential transfer and a fraudulent conveyance. On appeal again, the District Court reversed our finding of a preferential transfer, but affirmed our fraudulent conveyance ruling. In addition, the District Court affirmed our order to equitably subordinate the "claim" of ADB to the claims of post–1977 debenture holders. ADB appealed the District Court decision to the First Circuit Court of Appeals, which affirmed our finding of fraudulent conveyance, but modified this ruling (and that of the District Court) to recognize the fraudulent conveyance as dating back to the 1981 transfers. The Court of Appeals went one step further, holding, pursuant to Bankruptcy Code § 550(b)(1), that the transferred assets were recoverable from ADB as the transferee of fraudulently conveyed property, which was taken neither in good faith, nor "without knowledge of the voidability of the transfer[s]." *See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1256, 1257 (1st Cir. 1991).

As the First Circuit found no evidence that ADB had ever filed a proof of claim in the bankruptcy case, it ruled that the equitable subordination issue was not properly before it, and remanded the matter to this Court to permit ADB to file such a claim. This Court was also instructed to consider again[2] whether to apply the doctrine of equitable subordination to any such claim filed by ADB and deemed allowed.

On October 4, 1991, ADB accepted the Court of Appeals' invitation and filed its Proof of Claim in the amount of $537,500, asserting it to be secured by (1) a mortgage on all the funeral home real estate; (2) a duly perfected security interest in all the personal property used in the funeral home operation; and (3) a pledge of all the debtor's[3] stock. On March 19, 1992, the Trustee filed his objection to ADB's claim on a number of grounds, including that the circumstances under which such security was obtained subjects it to subordination, as well as invalidation under §§ 547 and 548 of the Bankruptcy Code.

After considering and denying ADB's motion to reopen the proceeding to present evidence of nonreliance by the debenture holders, and granting the parties an opportunity to submit further memoranda in light of the present posture of the litigation, the matter is now ripe for (re)determination by this Court. Accordingly, our decision herein is based upon the entire record in these consolidated cases and in this adversary proceeding, including the original findings of this Court as stated in the decisions of October 21, 1988, and May 26, 1989; the District Court decision of October 4, 1989; the First Circuit Court of Appeals opinion dated February 28, 1991;

---

peals, the First Circuit Court of Appeals affirmed our ruling avoiding as a fraudulent conveyance the two transactions that resulted in ADB's ownership of the funeral home assets. In addition, the First Circuit remanded the proceeding to this Court: (1) ordering ADB to file a proof of claim in the bankruptcy case; and (2) ordering this Court to determine whether such claim should be allowed or disallowed, and if allowed, whether it should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

2. The First Circuit expressly stated that "[t]he bankruptcy court may conduct such further proceedings in the pending adversary proceedings between these parties as may be required to resolve any issue arising under Bankruptcy

Code § 510(c), or otherwise, as appropriate and consistent with this opinion, without restriction upon its power to base any equitable subordination determination, in whole or in part, on the record made earlier in these adversary proceedings."

3. Throughout this decision we characterize the debtor as a single entity. Technically however, the debtor consists of two corporations, EMB Associates, Inc. and the Sugarman Funeral Home, Inc. For simplification and convenience (the bankruptcy cases were consolidated), we will refer only to the "debtor". For the same reason, we refer to "Brier" and "ADB" interchangeably.

the October 4, 1991 Proof of Claim of ADB; and the Trustee's Objection thereto.

## II. DISCUSSION

### A. *Allowance/Disallowance of the Claim*

Our first task is to determine whether ADB's claim should be allowed or disallowed in these consolidated bankruptcy cases. The parties chose not to present oral argument on this issue, so we will refer to the prior and present record to resolve this dispute. The Trustee's written submission states five reasons in support of his objection to allowance of the claim under 11 U.S.C. § 502. However, the Trustee fails to articulate which provision(s) of § 502 he relies upon. Subsection (a) of § 502 states in pertinent part:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed *allowed,* unless a party in interest ... objects.

11 U.S.C. § 502(a) (emphasis added).

11 U.S.C. § 502(b) provides that:

Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount....

11 U.S.C. § 502(b).

Our review of the numbered paragraphs coming after this subsection do not reveal any provision in support of the Trustee's objection. Of the five grounds presented by the Trustee, only three seem to address the merits of the *allowance* of the claim. These are: (1) that "[t]he Debtor is not indebted to the Claimant;" (2) that "[t]he claimant collected rents on the property of the Trustee and has not accounted for the same in its Proof of Claim and therefore the claimant has failed to show the proper amount due as is required;" and (3) that "[t]he Proof of Claim was not timely filed."

 As to ground number one, it is summarily rejected in light of our October 21, 1988 factual finding that "[b]etween January 1973 and March 1980, $467,500 was advanced to EMB by ADB." *Monzack v. A.D.B. Investors (In re EMB Assocs., Inc.),* 92 B.R. 9, 12 (Bankr.D.R.I.1988). As to the remaining two grounds, we note that during the time this opinion was in draft, we instructed the Trustee to file a legal memorandum in support of his objection to claim. In said memorandum, the Trustee asserts that ADB's claim cannot be allowed because (1) it failed to turn over or account for rents to the Trustee in violation of § 502(d), and (2) the claim was filed improperly in the adversary proceeding, and not in the bankruptcy case. As to the first ground, we are unable to rule on the merits of the Trustee's objection without evidence presented in support thereof. Accordingly, having waived such presentment, that basis is rejected. In addition, the fact the claim was technically misfiled is curable and is not a ground for its disallowance, in the circumstances of this aged bankruptcy case. The remainder of the Trustee's memorandum concerns the application of the doctrine of equitable subordination, which is only relevant if ADB is deemed to hold an *allowed* claim. Presented with only bare allegations, the Trustee's objection is insufficient to rebut the prima facie validity of ADB's proof of claim. *See* Fed. R.Bankr.P. 3001(f).

 However, neither has ADB submitted any evidence of the actual payments made to the debtor as set forth in its Proof of Claim, other than what it previously introduced during the 1988 trial of this adversary proceeding. Accordingly, based upon the record as it stands, we rule that ADB's Proof of Claim should be and hereby is allowed in the amount previously determined by this Court in our October 21, 1988 decision, which was $467,500. *In re EMB Assocs., Inc.,* 92 B.R. at 12.

The issue of the secured status of this claim was fully litigated during the 1988 trial, and we have addressed this subject at length in both our October 1988, and May 1989 decisions. The core of the dispute concerns the circumstances in which the security was obtained, not the technical

validity of the security instruments as such. That is, the Trustee contends that the October 1980 promissory note in the amount of $500,000, and the mortgage and other security instruments were obtained by ADB in fraud of creditors, and that the "refinancing" was not the result of arms-length dealing. This issue, and the remaining grounds of the Trustee's objection to ADB's claim relate to the Trustee's demand for the equitable subordination of an allowed claim under 11 U.S.C. § 510(c), and not to the underlying validity of the security documents. On that basis, we rule that ADB's claim is to be treated as an allowed secured claim in the amount of $467,500, subject however to the § 510(c) issue, discussed below.

### B. *Equitable Subordination*

█ The remaining issue for determination is whether ADB's claim should be subordinated to the claims of post–1977 debenture holders, on account of ADB/Brier's conduct vis-a-vis non-insider investors. The basis for this determination is this Court's earlier made findings of fact, largely affirmed by the United States District Court and/or the First Circuit Court of Appeals, all of which have addressed the equitable subordination issue:

1. As the accountant for the Sugarman Funeral Home ("SFH") and EMB Associates ("EMB"), Alan Brier prepared misleading financial statements and false 1977–1978 federal income tax returns, in a deliberate effort to camouflage the true financial condition of the two companies, and that this was done, inter alia, to increase debenture sales. *Max Sugarman Funeral Home, Inc.*, 926 F.2d 1248, 1250, 1251.

2. These false financial statements understated EMB/SFH's interest payment obligations and also failed to disclose, other than in a brief footnote, the 1973 loan agreement between SFH and ADB. In addition, the relevant tax returns understated the interest payments being made at the time in question. *Id.*

3. Brier and Bosler concealed and/or withheld from prospective investors the terms of the 1973 loan agreement, the 1980 refinancing, the amount of the advances made, the repayment schedule and the substantial fees and expenses being paid to ADB. *In re EMB Assocs., Inc.*, 92 B.R. at 12, 17, 18.

4. As our October 21, 1988 findings of fact indicate, we questioned from the outset the onerous terms of the 1973 loan agreement which, in addition to excessive fees and interest, called for a balloon payment of all principal in the seventh year, with no clue as to where EMB/SFH would get the money necessary to pay the loan balance. In addition, an express condition of the 1973 loan agreement was that "the total indebtedness of EMB/SFH, including the debt to ADB, was not to exceed $1 Million," and that any borrowing in excess of that amount was to be subordinated to ADB's debt. This information was never disclosed to the debenture holders or the investing public, and we found as a fact that both Brier and Bosler intentionally omitted and suppressed that information in order to increase debenture sales. *In re EMB Assocs., Inc.*, 92 B.R. at 11, 12; *Max Sugarman Funeral Home, Inc.*, 926 F.2d. at 1250.

5. With complete knowledge that the July 1, 1980, $498,000 balloon payment could not be made, and upon discovering that ADB's security interest in the stock had not been perfected, Brier took the following steps in order to assure his recovery of the substantial advances previously made, and to improve his position over that of the debenture holders: EMB and ADB revised their credit relationship in October 1980 through the so-called "1980 refinancing," which consisted of: a promissory note by EMB/SFH to ADB in the amount of $500,000, secured by (1) a mortgage on the funeral home real estate; (2) a security interest in all of the personal property; as well as (3) a pledge of the funeral home stock. The 1980 note provided for an escalating payment schedule which, based upon financial information well known to both Brier and Bosler, could not be met by EMB/SFH, in light of its other substantial long term obligations—which were only increasing through the rapid sale of more

debentures. *Max Sugarman Funeral Home, Inc.*, 926 F.2d. at 1251, 1252.

6. The conduct of Brier and Bosler in arranging the 1980 mortgage occurred at a time when Brier knew of: (1) the substantial and increasing debenture holder debt; (2) the funeral home's inability to make the required balloon payment per the 1973 loan agreement; and (3) his own unsecured status in the SFH stock. These facts, taken collectively, clearly establish a course of inequitable conduct by Brier/ADB vis-a-vis the debenture holders. *In re EMB Assocs., Inc.*, 92 B.R. at 12, 13; *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 127 B.R. 508, 510, 513 (D.R.I.1989).

7. Brier, of course, had actual knowledge of the 1981 transfers, and was fully aware that Erwin Bosler remained active in the daily operation of the funeral home. *Max Sugarman Funeral Home, Inc.*, 926 F.2d. at 1251.

8. The financial condition of EMB/SFH worsened from 1978 through 1982, when finally an involuntary bankruptcy was commenced against it by several debenture holders. During 1978, debenture sales had tripled, and by the end of 1978, non-ADB debt exceeded the $1 Million level, triggering the 1973 loan subordination provision. Despite this, ADB continued to make advances to EMB.

9. By early 1979, it was obvious to Brier that EMB could meet its financial obligations to ADB only through more debenture sales. *Id.*

10. The 1980 refinancing was nothing more than a deceptive respite for EMB from the funeral home troubles. Default under the 1973 agreement was technically avoided only by the refinancing agreement and through the continued sale of debentures. Thus, it was not by accident that 60% of all debenture sales were generated during the four years preceding the bankruptcy filing, while total debenture sales spanned a twelve year period. *Id.* at 1251, 1252.

11. Shortly after the payments to ADB increased from $2,000 per month to $7,000 per month under the 1980 refinancing, EMB defaulted and promptly, after partici-

pating in a sham transfer of the entities to Dade Service Co. and Bristol Associates (the "1981 Transfers"), provided ADB with a "Deed in Lieu of Foreclosure" for the real estate, and also transferred to ADB the personal property (the so-called "1982 Transfers"). *In re EMB Assocs., Inc.*, 92 B.R. at 13, 14; *Max Sugarman Funeral Home, Inc.*, 926 F.2d. at 1252, 1253, n. 9).

12. EMB and SFH were insolvent beginning in 1978 when their long term debt surpassed the $1 Million debt subordination threshold. *Id.* at 1255.

## III. CONCLUSIONS OF LAW

Based upon the record established during the 1988 hearings in this matter, which for purposes of the equitable subordination issue remains unchanged, we previously ruled, and were affirmed by the United States District Court, that Brier/ADB improperly obtained the 1980 refinancing package consisting of: (1) a mortgage on the funeral home real estate; (2) a security interest in all of the personal property; and (3) a pledge of the stock. Brier's use of inside information gave him an ongoing unfair advantage over the debenture holders, as contemplated by § 510(c), requiring the subordination of ADB's claim to those of the post–1977 debenture holders. That ruling is restated herein and in support, we rely upon the following conclusions of law:

1. 11 U.S.C. § 510(c) empowers a bankruptcy court to subordinate, on equitable grounds, all or part of a claim to all or part of another claim, or order that any lien securing the subordinated claim be transferred to the estate. 11 U.S.C. § 510(c); *Max Sugarman Funeral Home, Inc.*, 127 B.R. at 513.

2. The preeminent test to determine whether to equitably subordinate a claim consists of three elements:

(i) The claimant must have engaged in some type of inequitable conduct;

(ii) The misconduct must have resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant;

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*Benjamin v. Diamond (In re Mobil Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977).

3. In October 1988, we held that Brier (ADB) was an insider of the Debtor based upon the degree of control he held and exercised over the financial activity of the funeral home. That finding is not altered here. *In re EMB Assocs., Inc.*, 92 B.R. at 16, 17. Thus, in the case of an insider, element one is met where there is "material evidence of unfair conduct." *Id.* at 15, (citing *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986); *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 714 (5th Cir.1980)).

4. We previously found this element to be satisfied where:

[w]ith all of this inside information [it] enabled Brier to assess his own personal financial involvement with EMB, and to determine that only through the sale of more debentures would he continue to collect interest and commissions under the 1973 loan. It should also be kept in mind that during all this time, Brier considered himself secured by the stock pledge for the principal amount of his loan, and that it was not until 1980 that he learned that his security interest was never perfected. Thus, Brier's special relationship enabled him to stay abreast of the financial condition of the business at all times, and definitely enhanced his ability to decide whether and/or when to make advances. As Brier continued to loan money to the SFH, while improving his position vis-a-vis the debenture holders, whether he likes it or not, David [sic] Brier acquired a fiduciary duty to people who, unknowingly, were continuing to invest in a failed enterprise. Finally, in 1980, when the expected became obvious, i.e. that the balloon payment to ADB was not forthcoming, and when Brier discovered that his stock pledge was unperfected, he was in a position to, and he did, insist on the October 10, 1980 foreclosure agreement, and thereby acquired complete domination over the debtor's financial future by instituting payment terms that were obviously designed to put the funeral home in yet another impossible position.... Having so concluded, it follows, that the Trustee has presented sufficient evidence of control and inequitable conduct to meet his initial burden.

*In re EMB Assocs., Inc.*, 92 B.R. at 16, 17.

In addition, we held that:

When the debt ceiling under the loan agreement was reached, Brier assumed an obligation to existing and future creditors, particularly the debenture holders, to take steps to stop the further accumulation of debt, and/or to at least disclose to potential investors the true condition of the business. Instead, Brier did nothing, while substantially more debenture debt was incurred, largely to his advantage.... [T]he conduct of David [sic] Brier put him in breach of his acquired fiduciary duty to the debenture holders of SFH. Not only did he fail to take any action to stop the solicitation and sale of more debentures, but upon learning of his unsecured status, he quickly demanded and received a mortgage on the real estate and a lien on the personal property as security for his antecedent debt. His continuing efforts to keep himself in a position superior to that of the unsuspecting debenture holders, constitutes a flagrant breach of his fiduciary duty to them.

*Id.* at 17.

5. The District Court affirmed this Court on the equitable subordination issue holding that:

Brier obtained the 1980 mortgage to secure his 1973 loan upon discovering that this loan was unsecured by the stock which was supposed to be in escrow. He had access to all the financial records of the business and was or should have been aware of the increase in debenture sales, above the ceiling amount, to finance the balloon payment coming due. The bankruptcy court could justifiably turn a particularly jaundiced eye toward the evolution of Brier's relationship from accountant-client to creditor-debtor, to

secured creditor and finally eventual owner.... The bankruptcy court determined that the circumstances surrounding the making of the 1980 mortgage did not bear the indicia of an arm's length bargain and should be invalidated.... Again, the bankruptcy court was better able to evaluate the credibility of the witnesses and the evidence and to determine that the mortgage should be set aside as inequitable and injurious to the other creditors. Since these findings of fact are not clearly erroneous, they will not be set aside.... The Court in this case determined that the holders of debentures issued between 1978 and 1982 and amounting to $890,000 possessed ethically superior claims to A.D.B.'s fraudulently obtained secured claim under the mortgage. It was justified in doing so.

*Max Sugarman Funeral Home, Inc.*, 127 B.R. at 513, 514.

6. Our original conclusions of law addressing the remaining two elements necessary to establish a claim for equitable subordination are set forth in pages 18 and 19 of our October 1988 decision, 92 B.R. at 9, and need not be restated herein. Nothing has substantively changed in this adversary proceeding since our October 1988 equitable subordination ruling was made and accordingly, we again hold that all of the factors necessary to invoke the doctrine of equitable subordination are present and that they are applicable on the facts before us.

Accordingly, for all of the above reasons, we ORDER that the lien securing A.D.B.'s claim be transferred to the Debtor's estate pursuant to 11 U.S.C. § 510(c)(2), and that the remaining unsecured claim of A.D.B. be and hereby is subordinated to the claims of unsecured creditors, including the holders of debentures issued between 1978 and 1982.

Enter Judgment consistent with this opinion.

